JUSTICE LEAPHART
delivered the Opinion of the Court.
¶1 The Judicial Standards Commission (the Commission) has filed a formal Opinion and Recommendation in this Court following a hearing on allegations made against Cascade County Justice of the Peace Michael S. Smartt by Cascade County Justice of the Peace Sam Harris and Troy Nelson Dye. The Commission has recommended that Smartt be removed from office. Smartt has filed exceptions to the proceedings before the Commission in which he raises 39 objections. We substantially agree with the findings of the Commission and suspend Smartt without pay through the end of his term, December 31, 2002.
¶2 We consolidate Smartt’s objections as follows:
¶3 1. Did the Commission commit any prejudicial error which requires reversal or dismissal of the proceedings or the complaints?
¶4 2. Were the Commission proceedings conducted in violation of the confidentiality provisions of Montana law?
¶5 3. Did the Commission err in denying Smartt’s motion to disqualify Chairman Warner?
¶6 4. Did the Commission err in denying Smartt’s motions for continuance?
¶7 5. Did the Commission err in denying Smartt’s motion to suppress evidence?
¶8 6. Did Smartt’s conduct violate the Canons of Judicial Ethics?
¶9 7. What appropriate sanction should this Court impose?
*511 ¶10 8. Should Smartt be assessed and ordered to pay the costs of this proceeding?

Facts and Procedural Background

¶11 The Cascade County Justice Court has two Justices, denominated as Departments 1 and 2. Michael Smartt was sworn in as Justice of the Peace (JP) for Department 1 in January 1999. Samuel B. Harris took office as Justice of the Peace for Department 2 in June 1999. The court, although separated into two departments, operates on a single budget and a single filing system. Office staff work for both departments and are not separately assigned. The two JPs share supervisory responsibilities over the Justice Court office staff.
¶12 The Justice Court office includes a general office area where the office clerks and manager generally work. The two JPs each have separate enclosed chambers within the general office area. The entire Justice Court office area has an outer door that is locked to restrict access to the general public. All office staff, the two JPs and the custodial staff have keys to the main Justice Court offices. Justice Court office staff routinely and frequently go in and out of both JPs’ chambers daily to locate files, put files in slots for upcoming trials, update calendars and ask questions.
¶13 For purposes of performing judicial duties, each JP was provided with a desktop computer used in chambers and a laptop computer. These were paid for by Cascade County and the State of Montana at public expense. The JPs were provided internet access on their computers, also at county expense.
¶14 The desktop computers used by the JPs and office clerks for word processing and calendaring were joined together on a network. The passwords on the JPs’ computers were “Judge 1” and “Judge 2” respectively, and the passwords for each were known to the other JP and to some of the office staff.
¶15 Susan Stevenson has been employed by the Cascade County Justice Court for 22 years and has been the office manager for at least ten years. Her duties include shutting down the office at the end of each working day, including checking that computer monitors are shut off daily and shutting down the entire system at the end of the day on Fridays.
¶16 Staff were not required to obtain permission to enter the JPs’ chambers, unless there was someone in chambers with the judge. Stevenson testified that she occasionally entered Smartt’s office and opened his desk drawer to put in money from weddings, whether or not Smartt was present. Additionally, she would occasionally answer the phone when she was in Smartt’s chambers and access the calendar on *512 Smartt’s computer to provide information to the caller. At times Smartt would call Stevenson and ask her to look for something on his desk. County computer support staff also entered the Jps’ chambers to perform computer support.
¶17 On Friday, October 13,2000, Stevenson mentioned to Harris that she was having difficulty with the automated backup system on the network. She indicated that staff members often leave programs open on their computers, which cause the backup program to fail. She also told Harris that a staff person in the computer support department had told her that Judge Smartt’s computer must have been in one of the programs on a previous occasion when the backup program failed. She requested Harris’s help in shutting down Smartt’s computer so she would not delete any open documents. Smartt had left earlier in the afternoon.
¶18 Stevenson and Harris entered Smartt’s chambers and went around his desk to check his computer terminal. The terminal screen was darkened in the “energy save” mode. Stevenson touched the mouse to reactivate the screen and clicked on the toolbar. At that point, three pornographic pictures came up on the screen. Two of the pictures showed individual men masturbating and the third picture showed two men engaged in oral sex. Stevenson said, “Oh my God,” and ran from the office. Harris testified that it was clear from the box surrounding the pictures that they came from an internet website. Harris printed the screen to record what he and Stevenson had seen, and then he hit the power button on the computer and shut it off.
¶19 Harris returned to Smartt’s chambers on the following Sunday and accessed the short term history file in the Internet Explorer program on Smartt’s computer. He found and recorded twenty days of website activity, including approximately 105 websites that appeared to be “quite obviously pornographic.”
¶20 Throughout the next few days, Harris returned to Smartt’s chambers and monitored any new internet activity. At some point during this time, Harris took digital photographs of the temporary internet files on Smartt’s computer which recorded website access beginning in August 2000.
¶21 Subsequently, Harris filed a sexual harassment complaint against Smartt with Cascade County and a complaint with the Judicial Standards Commission. Additionally, Harris made a report to the FBI because the names of some of the websites accessed on Smartt’s computer indicated that they were meant to portray child pornography. The FBI obtained a search warrant and seized Smartt’s desktop computer and his laptop computer. The FBI found that the two computers contained in excess of 18,000 pornographic images or *513 files. The images found did not contain child pornography, although an FBI agent stated that they “pushed the limit.”
¶22 Smartt admits using the county internet service and his county computer to access sexually explicit material on the internet. He testified that his access of this material was related to a joke birthday card he was planning for his wife’s upcoming 50th birthday. He told the FBI investigator that he had about thirty to forty pornographic picture files on his desktop computer.
¶23 Upon receiving Harris’s complaint, the Judicial Standards Commission sent a copy of the complaint to Smartt. The Commission received Smartt’s response in November 2000 and directed the Honorable John Warner, chairman of the Commission, to pursue an informal resolution of the complaint. Sometime in late November, Warner became aware of a Montana Department of Justice Criminal Investigation Bureau (CIB) investigation of Smartt. He thought the investigation may be related to the Harris complaint and applied to the First Judicial District Court for release of the CIB file. The court ordered release of the file and the Commission received the file on December 4, 2000.
¶24 Upon review of the file, Warner discovered that the investigation did not concern the Harris complaint, but rather concerned a factual allegation of criminal conduct made by Troy Dye against Smartt. Dye testified that he met Smartt on the street in Sydney, Montana, sometime in early May 2000. Smartt introduced himself to Dye and said he was a Cascade County JP or judge and that he was in town for a conference. Dye responded that “maybe I shouldn’t be talking to [you] because I had some trouble with the law.” Smartt then invited Dye to come back to his motel room and have a drink and discuss Dye’s legal problems. Smartt told Dye that he “wasn’t a cop, he couldn’t arrest me.”
¶25 Smartt and Dye went to Smartt’s room and had two or three drinks each. They discussed general things and also talked about outstanding warrants on Dye. Smartt testified that he told Dye, ‘You know you’re going to be arrested if you attract attention so why don’t you just keep your nose clean and behave.” Smartt also testified that Dye told him he was fixing up a house in Sydney. Because Smartt is also interested in building, he and Dye walked from the motel to Dye’s house. Dye testified at the hearing that he and Smartt smoked marijuana while at Dye’s house, but Smartt testified that they only went there to see the house and did not stay long. He emphatically denied smoking marijuana with Dye.
¶26 When they left Dye’s house, they walked to the Ranger Bar to have dinner. Dye testified that while eating, Smartt asked him if he *514 would “like to go to his room and take a shower with him.” The statement shocked Dye and he got up and left. Smartt testified that he never asked Dye to take a shower with him, but instead, Dye told him at the bar that he had no running water in his house and he really needed a shower. Smartt replied that Dye could have taken a shower earlier when they were at Smartt’s motel room. Smartt testified that Dye was “getting toasted,” and he inexplicably got up and left.
¶27 According to Smartt’s version of events, after Dye disappeared, Smartt went and checked the bathroom to see if Dye was alright. He could not find Dye anywhere in the bar, so he paid the bill. Dye had left $5 and a pair of gloves sitting next to his plate. Because he was worried that something had happened to Dye because he was so drunk, and also to return Dye’s gloves, Smartt walked back to Dye’s house. The door was not locked, so he opened it and saw that Dye had fallen off the couch in a very awkward position. When Smartt walked into the room to put the gloves on the couch, Dye woke up and staggered backwards. At that point, Dye said something to Smartt about taking a shower in his motel room and they left together. About halfway back to the motel, Dye just walked across the street and started talking to a man. Smartt testified that he was glad Dye left because he really needed to go to bed.
¶28 Dye, on the other hand, testified that he left the bar after Smartt’s strange comment and went home and went to sleep on the couch. Some time later, he woke up when “somebody had grabbed me ... by the balls and picked me up by my crotch....” Once awake, he recognized Smartt. Smartt grabbed Dye by the arm and said, “Let’s go in here,” leading Dye to the bedroom. Dye responded, “No,” and went out the front door. Dye testified that he did not know what to do. He thought about hitting Smartt, but he did not think anyone would believe his version of the story over a judge’s version. They started walking down the block, and Dye saw a young man. Dye asked him if he could walk with him and turned away from Smartt and walked back to his house.
¶29 Dye did not report this incident for several months. He had warrants outstanding and did not want to call attention to himself. When he was picked up for the warrants, he reported the incident to the judge and asked the judge how he could file a complaint against Smartt.
¶30 Commission Chairman Warner advised Smartt of the Dye allegations in a letter dated December 27, 2000. On December 30, 2000, Warner met informally with Smartt and his attorneys. A court reporter was present, and a transcript of the meeting was prepared and filed in the Commission office. Smartt requested, and received, a copy of the transcript.
*515 ¶31 After the meeting, Warner forwarded a copy of the entire CIB file to Smartt and Smartt responded to Dye’s allegations on January 28, 2001. The Commission then retained Gregory Gould as prosecuting attorney and directed him to file a formal complaint. Gould informed Smartt that if he resigned his position, a formal complaint would not be filed. Smartt notified Gould and the Cascade County Commissioners that he intended to resign from his position as Justice of the Peace effective July 1, 2001. On July 2, 2001, Smartt withdrew his resignation. Gould then filed the Commission’s formal complaint with the Clerk of the Supreme Court.
¶32 Smartt petitioned the First Judicial District Court for a writ of prohibition, which was issued on July 20, 2001. The writ barred the Commission from further proceedings against Smartt based on an unverified complaint until further order from the court.
¶33 The Commission moved to vacate the writ. Following oral argument, the court entered an order modifying the writ. The order allowed the Commission to proceed on the basis of verified complaints alleging matters within the jurisdiction of the Commission. Smartt appealed the District Court’s modification and we affirmed. State ex rel. Smartt v. Judicial Standards Commission, 2002 MT 148, 310 Mont. 295, 50 P.3d 150 (Smartt I).
¶34 A hearing was held before the Judicial Standards Commission on the formal complaint and the Commission subsequently filed its Opinion and Recommendations with this Court. Smartt filed a brief, raising 39 objections to the Commission’s proceedings. Gould, as the prosecuting attorney, filed a response.

Standard of Review

¶35 Section 3-1-1107, MCA, states:
Action by supreme court. (1) The supreme court shall review the record of the [Commission] proceedings and shall make such determination as it finds just and proper and may:
(a) order censure, suspension, removal, or retirement of a judicial officer; or
(b) wholly reject the recommendation.
¶36 Accordingly, we review the Commission’s proceedings de novo. The Commission’s recommendations are not binding on this Court. We consider the evidence and then exercise independent judgment.

Issue One

¶37 Did the Commission commit any prejudicial error which requires reversal or dismissal of the proceedings or the complaints?
¶38 Smartt raises several objections to the procedure followed by the *516 Commission in this case and argues that, in the aggregate, these errors are so egregious that the proceedings against him should be dismissed. A majority of these objections were raised in Smartt’s earlier appeal concerning the dismissal of the writ of prohibition and have been disposed of in this Court’s opinion in that case. Smartt I. After consideration, we conclude that the remaining procedural objections are meritless and we decline to address them.[1]

Issue Two

¶39 Were the Commission proceedings conducted in violation of the confidentiality provisions of Montana law?
¶40 Article VII, Section 11 of the Montana Constitution states that the proceedings of the Commission are confidential “except as provided by statute.” Section 3-1-1105, MCA, states that “Except as provided in 3-1-1107 and 3-1-1121 through 3-1-1126, all papers filed with and proceedings before the commission or masters are confidential and the filing of papers with and the testimony given before the commission or masters is privileged communication.”
¶41 However, if the Commission finds good cause to order a hearing in a matter, the Commission must allow public access to all the papers relating to each finding of good cause and to the proceeding and the records of the proceedings. Section 3-1-1121, MCA. Any hearing conducted before the Supreme Court relative to a recommendation by the Commission, together with all papers pertaining to such recommendation, shall be accessible to the public. Section 3-1-1107(2), MCA. A judge may waive confidentiality and request in writing that proceedings be accessible to the public. Section 3-1-1122, MCA.
¶42 Smartt argues that there is “inherent confusion if not direct conflict in the foregoing provisions regarding confidentiality.” We disagree. The statutory provisions maintain confidentiality of Commission records until the filing of a formal complaint. After a formal complaint has been filed, certain papers, proceedings and records of proceedings become accessible to the public.
*517 ¶43 Confidentiality provisions are enacted to protect the reputation of innocent judges wrongfully accused of misconduct; maintain confidence in the judiciary by avoiding premature disclosure of alleged misconduct; encourage retirement as an alternative to costly lengthy formal hearings and protect commission members from outside pressures. Jeffrey M. Shaman etal., Judicial Conduct and Ethics § 13.15 (3rd ed. 2000). Montana’s statutory framework balances these goals against the public’s right to know, as guaranteed in Article II, Section 9 of the Montana Constitution. A complaint against a judicial officer is confidential until the Commission finds good cause to order a hearing. Once good cause is found and a formal complaint is filed, the legislature has determined that the public’s right to know outweighs the individual judge’s right to privacy.
¶44 Smartt also argues that the Commission unlawfully provided copies of the CIB investigation file to the Commission members and its prosecutor, “who in turn filed it as Exhibits [sic] within the formal hearing in this matter, which, as a result, makes the matter a public record.”
¶45 Section 44-5-303, MCA, provides, in pertinent part:
(1) Except as provided in subsections (2) through (4), dissemination of confidential criminal justice information is restricted to criminal justice agencies, to those authorized by law to receive it, and to those authorized to receive it by a district court upon a written finding that the demands of individual privacy do not clearly exceed the merits of public disclosure.
(3) Unless otherwise ordered by a court, a person or criminal justice agency that accepts confidential criminal justice information assumes equal responsibility for the security of the information with the originating agency. Whenever confidential criminal justice information is disseminated, it must be designated as confidential.
¶46 Smartt does not argue here that the Commission was not authorized to receive the files, only that it unlawfully made the files public by including them as an exhibit at the formal hearing. A review of the transcript reveals that the CIB file was not admitted into evidence during the hearing. At the beginning of the hearing, Gould stated that, “the prosecution had provided to the Respondent copies of premarked exhibits several weeks ago. There were quite a few exhibits. We won’t be using all of those today ...” Despite the fact that the CIB file was not admitted at the hearing, it is included in the bound volume of prosecution exhibits. Smartt did not object at the hearing to its inclusion with the admitted exhibits, therefore any *518 argument he may have concerning breach of his privacy has been waived.

Issue 3

¶47 Did the Commission err in denying Smartt’s motion to disqualify Chairman Warner?
¶48 Smartt filed a motion to disqualify Warner, alleging that Warner “overstepped the role of investigator in this Cause.” In support of this allegation, Smartt relies on many of the procedural errors he has raised elsewhere, on Warner’s request for the CIB file, on the fact that Warner instigated a meeting “under the guise of Commission Rule 10(g),” but ultimately for the purpose of gathering information against Smartt, and also on an allegation that Warner and Smartt engaged in a “heated debate” at a meeting of the judiciary in Poison, Montana.
¶49 Four members of the Commission considered the motion to disqualify and found that Warner did not attend a judicial conference in Poison. The Commission members also reviewed the written records and transcripts of Warner’s contact with Smartt and concluded that Warner showed no bias or prejudice in his dealings with Smartt.
¶50 In Smartt I, we disposed of Smartt’s procedural arguments and concluded that the Commission and by extension, Warner, did not exceed its jurisdiction in obtaining a copy of the CIB file. Smartt I, ¶ 30. A transcript of the meeting between Warner and Smartt, which Smartt alleges was a “fishing expedition,” reveals that Warner informed Smartt that the basis of the meeting was to give the judge a chance to avoid publicity. At the meeting, Warner informed Smartt that the Commission was taking the two complaints seriously and that Smartt might want to consider the fact that a formal complaint becomes public. As noted earlier, one of the underlying purposes of the confidentiality provisions is to encourage retirement as an alternative to costly, lengthy, and public formal hearings. Warner in no way implied that he was biased or prejudiced against Smartt by imparting this information.[2]
¶51 Smartt does not raise any argument against the Commission’s finding that Warner did not attend the meeting in Poison where Smartt alleges his “heated debate” with Warner took place. Thus, this basis for disqualifying Warner has been waived.
*519 ¶52 After reviewing the complete record, we agree that Warner showed no bias or prejudice in his dealings with Smartt. We conclude that the Commission did not err in denying Smartt’s motion to disqualify Warner.

Issue 4

¶53 Did the Commission err in denying Smartt’s motions for continuance?
¶54 Smartt argues that the Commission should have granted a continuance of the Formal Hearing and that the failure to do so deprived him of a fair opportunity to defend the charges against him. He argues that there were dispositive motions pending in the District Court and that the prosecution’s witness list, provided two weeks before trial, included 15 previously undisclosed witnesses.
¶55 Smartt was given written notice of the Harris complaint in October 2000. He received the complete CIB file on the Dye complaint in early January 2001. He received a draft of the formal complaint in May 2001. The scheduling conference was held on July 11, 2001. The writ of prohibition was lifted on August 15, 2001.
¶56 The prosecution gave its witness list to Smartt within the time limit set at the scheduling conference. Although Smartt argues that 15 witnesses listed were previously unknown to him, he does not specify who those witnesses were and the prosecution claims that the only witness who may not have been previously disclosed was their computer expert. The dispositive motion that was pending in District Court was, in fact, a motion for reconsideration of the court’s August 28,2001 order lifting the writ of prohibition. There is nothing unusual about preparing for a hearing while dispositive motions are pending. If Smartt failed to do so, he cannot fault the Commission.
¶57 We conclude that the Commission did not err in denying Smartt’s motions for continuance.

Issue 5

¶58 Did the Commission err in denying Smartt’s motion to suppress evidence?
¶59 At the outset, we restate the evidence that was obtained from each entry into Smartt’s chambers. The first entry, when Harris and Stevenson entered Smartt’s chambers to shut down his computer, yielded the pornographic images on the computer screen which Harris printed. The second entry yielded lists of websites Harris hand copied from the history file on Smartt’s internet software. Further entries yielded digital photographs of the long term history of internet activity on Smartt’s computer. Subsequently, the FBI confiscated and searched *520 Smartt’s computer. That search resulted in testimony concerning the number of images found on the hard drive of Smartt’s desktop and laptop computers, as well as a characterization of those images. Because the FBI justified its search by information gathered from Harris’s second and subsequent entries into Smartt’s chambers, we will analyze the search issue at two levels.
¶60 The Commission determined that the evidence seized by Harris on his second and subsequent entries into Smartt’s chambers was wrongfully obtained in violation of Smartt’s federal and state constitutional rights. However, the Commission concluded that the exclusionary rule did not apply to its proceedings because the proceedings are disciplinary in nature, not criminal. Therefore, the Commission considered all the evidence.
¶61 Smartt argues that all the evidence seized from the first and subsequent entries into his chambers violated his constitutional rights and should be suppressed. For support, he relies on this Court’s opinion in Gryczan v. State (1997), 283 Mont. 433, 942 P.2d 112, concerning the elevated right of privacy under Montana’s Constitution.
¶62 Gould argues that the Commission incorrectly ruled that an unlawful search occurred. He argues that (1) Smartt had no legitimate expectation of privacy as to matters received through the internet on his county-owned computer in his county-owned office; (2) that Harris had a duty as a supervisor of court employees to protect them from sexually explicit material; and (3) the doctrine of “inevitable discovery” legitimizes the search.
¶63 When analyzing search and seizure questions that specially implicate the right of privacy under Montana’s Constitution, we consider Sections 10 and 11 of Article II of the Montana Constitution. State v. Boyer, 2002 MT 33, ¶19, 308 Mont. 276, ¶ 19, 42 P.3d 771, ¶ 19. These sections provide:
Section 10. Right of privacy. The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest. Section 11. Searches and seizures. The people shall be secure in their persons, papers, homes and effects from unreasonable searches and seizures. No warrant to search any place, or seize any person or thing shall issue without describing the place to be searched or the person or thing to be seized, or without probable cause, supported by oath or affirmation reduced to writing.
¶64 To determine the threshold question of whether there has been an unlawful government intrusion into one’s privacy, this Court looks to the following factors: (1) whether the person has an actual expectation of privacy; (2) whether society is willing to recognize that *521 expectation as objectively reasonable; and (3) the nature of the state’s intrusion. Boyer, ¶ 20. Where no reasonable expectation of privacy exists, there is neither a “search” nor a “seizure” within the contemplation of Article II, Sections 10 and 11 of the Montana Constitution. Boyer, ¶ 20.
¶65 We have recognized that Montana’s unique constitutional language affords citizens a greater right to privacy and therefore, broader protection than the Fourth Amendment in cases involving searches of, or seizures from, private property. See Gryczan, 283 Mont, at 448, 942 P.2d at 121; State v. Bullock (1995), 272 Mont. 361, 384, 901 P.2d 61, 75; State v. Siegal (1997), 281 Mont. 250, 263, 934 P.2d 176, 183 (overruled in part on other grounds); State v. Scheetz (1997), 286 Mont. 41, 45, 950 P.2d 722, 724. However, “even inMontana, when a person leaves the privacy of his home and exposes himself and his effects to the public and its independent powers of perception, it is clear that he cannot expect to preserve the same degree of privacy for himself or his affairs as he could expect at home.” Scheetz, 286 Mont, at 49, 950 P.2d at 726.
¶66 In his brief, Smartt quotes several paragraphs from Gryczan, apparently arguing that because the image revealed on his computer implicates his “decision as to sexual matters,” it qualifies for a heightened privacy protection. He states that he “has suffered the most degrading and humiliating intrusion into a matter involving his private and intimate relationship with his wife.” In his argument, Smartt likens pornography to homosexuality, in that both are practices not approved of by society in general. He argues that he has been persecuted as a result of society’s sense of “super morality,” and he likens the Commission proceedings to the Salem Witch Hunt. Smartt’s argument is patently absurd.
¶67 In Gryczan, we stated that “consenting adults expect that neither the state nor their neighbors will be co-habitants of their bedrooms.” 283 Mont, at 450, 942 P.2d at 122. In that case, plaintiffs were subjected to possible criminal penalties for personal choices that they exercised in the privacy of their homes. Had Smartt restricted his viewing of pornographic images to his bedroom, we would undoubtedly not be here today. However, to compare Smartt’s choice of accessing sexually explicit material at work on his county-owned computer to the situation of the plaintiffs in Gryczan is to push legal analysis beyond credibility. The fact that the image revealed on Smartt’s computer had sexual content does not influence the privacy analysis. In other words, just because something has sexual content does not mean it is private under the Gryczan decision or the Montana Constitution.
¶68 Harris and Stevenson first entered Smartt’s chambers because of *522 problems encountered with the network backup software. Stevenson requested Harris’s assistance in shutting down Smartt’s computer because she was not familiar with the programs the JPs operated and was afraid she would lose new data if she closed the programs incorrectly. This entry into Smartt’s chambers was for a legitimate, work-related pin-pose. At that time, they were not looking for evidence of misconduct, but were simply performing a standard office procedure: shutting down all the computers so the network could perform a backup.
¶69 Irrespective of whether Smartt had any expectation of privacy with regard to the images on the computer screen, the nature of the intrusion did not rise to the level of a search. Boyer, ¶ 20. We conclude that Harris and Stevenson’s noninvestigatory, work-related entry into Smartt’s chambers did not constitute a search under the Fourth Amendment or Article II, Section 11 of the Montana Constitution. Consequently, we will consider the evidence derived from that entry.
¶70 Because, as discussed below, we conclude that this evidence alone supports the Commission’s finding that Smartt violated the Canons of Judicial Ethics, we need not reach the question addressed by the dissent, that is whether Harris’s subsequent entries into Smartt’s chambers violated his constitutional rights to privacy and to be free from unreasonable searches and seizures.

Issue 6

¶71 Did Smartt’s conduct violate the Canons of Judicial Ethics?
¶72 The Commission concluded that Smartt violated Canons 1,4 and 34 of the Canons of Judicial Ethics. Those provisions state:
Canon 1: Relations of the Judiciary:
The assumption of the office of judge casts upon the incumbent duties in respect to his personal conduct which concern his relation to the state and its inhabitants, the litigants before him, the principles of law, the practitioners of law in his court, and the witnesses, jurors and attendants who aid him in the administration of its functions.
Canon 4: Avoidance of Impropriety:
A judge’s official conduct should be free from impropriety and the appearance of impropriety; he should avoid infractions of law; and his personal behavior, not only upon the Bench and in the performance of judicial duties, but also in his everyday life, should be beyond reproach.
Canon 34: A Summary of Judicial Obligation:
In every particular his conduct should be above reproach. He should be conscientious, studious, thorough, courteous, patient, *523 punctual, just, impartial, fearless of public clamor, regardless of public praise, and indifferent to private, political or partisan influences; he should administer justice according to law, and deal with his appointments as a public trust; he should not allow other affairs or his private interests to interfere with the prompt and proper performance of his judicial duties, nor should he administer the office for the purpose of advancing his personal ambitions or increasing his popularity.
¶73 The Commission concluded that Smartt “knowingly accessed sexually explicit images on a Cascade County computer and monitor. In this day of electronic communications, the Commission can find no distinction between this type of conduct and leaving a magazine with the same photo on the cover exposed to the office staff.... Stevenson, who was attempting to perform one of her managerial functions in turning off the computer on a Friday afternoon was exposed to the sexually explicit material without her consent.”
¶74 To determine if Smartt’s conduct violated these Canons, we rely on the following: Stevenson’s testimony concerning the images that she saw; Harris’s testimony concerning these same images; Dye’s testimony; Judge Smartt’s testimony concerning his access to pornographic websites, and his testimony concerning the Dye incident.
¶75 The charge that Smartt accessed sexually explicit images on his county-owned computer, and exposed Harris and Stevenson to these images, was proven by clear and convincing evidence. Smartt admitted in his testimony and in his press release that he had accessed such sites at work on his county-owned computer and admitted that his co-workers were exposed to pornographic images.
¶76 We agree with the Commission’s conclusion that this conduct violated the Canons of Judicial Ethics.
¶77 Although the Commission found that there was no clear and convincing evidence that Smartt committed either a burglary or sexual assault against Dye, it concluded that “there is no question that Smartt was in the Dye residence uninvited.” Smartt admitted that he invited Dye back to his motel room for a drink after Dye mentioned he had some legal problems. Smartt testified that his advice to Dye was “you know you’re going to be arrested if you attract attention so why don’t you just keep your nose clean and behave.” It is clear to this Court that Smartt’s admitted conduct with Dye was inappropriate and, at the very least, created an appearance of impropriety.
¶78 We conclude that Smartt’s behavior in both incidents violated Canons 1, 4 and 34.

*524
Issue 7

¶79 What is the appropriate sanction to be imposed by this Court?
¶80 Section 3-1-1107, MCA, states that this Court shall review the record of the Commission proceedings and “shall make such determination as it finds just and proper and may ... order censure, suspension, removal or retirement of a judicial officer.”
¶81 The focus of sanctions injudicial disciplinary proceedings is not to punish the individual judge, but to restore and maintain the dignity, honor, and impartiality of the judicial office, and to protect the public from further excesses. See In re McCormick (Iowa 2002), 639 N.W.2d 12, 16; In re Stephenson (N. C. 2001), 552 S.E.2d 137, 139. Courts in other states have outlined numerous criteria to apply in determining the appropriate sanction. See In re Trudel (Mich. 2002), 638 N.W.2d 405, 408; In re Hammermaster (Wash. 1999), 985 P.2d 924, 941-42; In re Johnstone (Alaska 2000), 2 P.3d 1226, 1237; Office of Disciplinary Counsel v. Medley (Ohio 2001), 756 N.E.2d 104, 107. These can be summed up as: a consideration of the duty violated, the respondent’s mental state, the injury caused, and existence of mitigating or aggravating circumstances.
¶82 In this case, Smartt violated his duty to his co-workers and the duty to be free from impropriety and the appearance of impropriety. Although Smartt admits that he accessed sexually explicit websites at work on his county-owned computer and exposed his co-workers to pornographic images, he never acknowledges the impropriety of such conduct or the effect it has on the integrity and respect for the judiciary. Throughout his brief, Smartt attacks every conceivable aspect of the Commission proceedings in an effort to convince this Court that the Commission was on a witch hunt and has caused his family and him immeasurable harm without good cause. We conclude that is simply not the case, and Smartt’s failure to accept responsibility for his actions is almost as troubling as his initial misconduct.
¶83 Smartt’s conduct has had a negative effect on the public’s perception of the judiciary. His conduct has been the subject of considerable publicity and news coverage, including some initiated by Smartt himself. Rather than admit to any wrongdoing himself, Smartt has publicly criticized Harris’s actions in this matter. Additionally, other than his claim that he was composing a joke birthday card for his wife, Smartt offers no evidence of mitigating factors. Even if true, that is no excuse for using public time and facilities to view pornography and to expose co-workers to such offensive pictures.
¶84 Applying the above criteria to this case, we determine that suspension is the appropriate sanction. Accordingly, Judge Smartt is hereby suspended from the performance of his judicial duties, without *525 pay, from the date of this opinion through December 31, 2002.

Issue 8

¶85 Should Smartt be assessed and ordered to pay the costs of this proceeding?
¶86 The Commission unanimously requested that this Court order that Smartt be assessed and pay the costs of this proceeding. Rule 13(h) of the Rules of the Judicial Standards Commission states, in pertinent part, that:
Should the commission find charges in a formal complaint to be true, and a recommendation for discipline as provided in Rule 9(c) be accepted and imposed by the supreme court, the responding judge may be assessed and required to pay all costs of the proceedings before the commission, including reasonable attorneys fees of the prosecuting attorney.
¶87 It is therefore ordered that Smartt shall pay all the costs of the proceedings involving these matters. The Commission shall submit a statement to the Clerk of the Supreme Court of the total costs within 10 days from the date of this order. Smartt shall have 10 days from the date the statement is submitted in which to file any objections to the costs assessed against him. This Court will then enter a final order regarding the costs assessed against Smartt.
JUSTICES REGNIER and RICE concur.

 These included objections that the commission members wore judicial robes at the hearing; that statements in Warner’s letter were “inappropriate and beneath the ethical standards that we should expect of the Commission;” that the use of Supreme Court facilities for the Commission proceedings raised the possibility of the Supreme Court indirectly influencing the proceedings; that the Commission’s appointment of Warner to handle procedural matters cited a non-existent rule number; that Dye’s complaint was not on the correct form and did specify- which Canons Smartt allegedly violated; that the Notice of the Formal Complaint was signed by Warner and not by “the Commission;” that the denial of the opportunity to give closing arguments at the formal hearing equated to a denial of effective assistance of counsel; and that certain statements by Warner at the hearing were “grossly irregular” and “highly prejudicial.”

 We note that the transcript of the meeting was not offered into evidence by either party at the hearing and, as such, remains part of the confidential Commission file. However, Judge Smartt has apparently waived his confidentiality with respect to this transcript by including a copy of it in the Appendix filed with his exceptions to the Commission proceedings.