FILED

06/22/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0731

DA 19-0731

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2021 MT 151

STATE OF MONTANA,

      Plaintiff and Appellee,

   v.

TRAVIS STAKER,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Eighteenth Judicial District,
In and For the County of Gallatin, Cause No. DC-2019-200-B
Honorable Rienne H. McElyea, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Mark J. Luebeck (argued), Angel, Coil & Bartlett, Bozeman, Montana

      For Appellee:

      Austin Knudsen, Montana Attorney General, Mardell Ployhar (argued),
Assistant Attorney General, Helena, Montana

      Marty Lambert, Gallatin County Attorney, Bjorn E. Boyer, Deputy County
Attorney, Bozeman, Montana

    For Amicus Montana Association of Criminal Defense Lawyers:

      Colin M. Stephens (argued), Smith & Stephens, P.C., Missoula, Montana

Argued: March 26, 2021
Submitted: March 30, 2021
Decided: June 22, 2021

Filed:

_____
Clerk

Justice Dirk Sandefur delivered the Opinion of the Court.

¶1 Travis Michael Staker (Staker) appeals the September 2019 judgment of the Montana Eighteenth Judicial Court, Gallatin County, denying his motions to suppress his unwitting text message conversation with an undercover federal agent and accordingly dismiss the resulting charge of patronizing prostitution, a misdemeanor in violation of § 45-5-601(2)(b), MCA. We address the following restated issue:

> *Whether the District Court erroneously concluded that Staker had no reasonable expectation of privacy in text messages sent unknowingly to an undercover federal agent posing as a sex worker under an internet advertisement?*

We affirm.

### PROCEDURAL AND FACTUAL BACKGROUND

¶2 During the week of August 26, 2018, officers of the Gallatin County Sheriff's Office, Bozeman Police Department, and the United States Department of Homeland Security conducted a warrantless internet sting operation targeting individuals who responded affirmatively to a thinly-veiled advertisement placed on various internet websites for sex-for-hire. The ad purported to be from a female identified only as "Lily" and directed those interested to respond either by email to a specified address, or by text message to a specified cell phone number. The ad did not disclose that the phone number was actually the number to a cell phone owned by law enforcement and that a law enforcement officer would thus be responding as "Lily."

¶3 Staker responded to the ad by text message from his cell phone and thereafter engaged in an ongoing text message conversation with "Lily," the purported offeror of the

2

advertised services.  Upon settling by text on the scope of services, price, date, and time,[1] "Lily" directed Staker to the Bozeman Hilton Garden Inn to meet-up for the negotiated sexual transaction at 7:00 p.m. that night.[2]

¶4     Upon Staker's entry into the back entrance of the Hilton Garden Inn as directed, lying in wait were a Bozeman police detective and the involved federal agent who promptly arrested him.  A warrantless search of Staker's person incident to arrest yielded his cell phone and sufficient cash to pay for the price negotiated with "Lily."  After seizing his cash and cell phone, officers took him to the Gallatin County Detention Center for booking.  In May 2019, the State formally charged Staker in the Gallatin County Justice Court with patronizing prostitution, a misdemeanor.

¶5     Based on a stipulated set of facts, Staker later filed a motion for suppression of his text message conversation with "Lily,"[3] and for dismissal of the case due to the resulting lack of evidence.  He essentially asserted that the warrantless use of an undercover officer

---

[1] In response to "Lily's" questions, "[w]hat's ur [sic] name," "how much time do you want," and "[y]ou let me know what you want and what kind of donation," Staker texted that he wanted "FS" (meaning full service sexual intercourse), "GFE" (meaning the girlfriend experience), and $160.00.  "Lily" accepted, and the text discussion turned to when and where.

[2] Under the guise of "her" purported need for discretion, "Lily" directed Staker by text to the parking lot of the Bozeman Home Depot and to then text "her" for further instruction.  Upon his arrival text, "she" next directed him by text to the parking lot of the Lowe's Home Center adjacent to the hotel, and to then text "her" for "her" room number.  Upon his arrival text at Lowe's, "Lily" texted "her" purported room number and directed him to the rear entrance of the hotel, and then down the hall to the left to "her" room.

[3] The motion sought suppression of the text message conversation and all evidence derived therefrom.

3

to induce his response to the false internet ad and ensuing text message conversation with "Lily" violated his right to privacy under Article II, Sections 10-11 of the Montana Constitution. The Justice Court agreed and granted the motion to suppress evidence, but denied the motion to dismiss. The State appealed the suppression ruling to district court pursuant to §§ 46-17-311(2) and 46-20-103(2)(c), MCA.

¶6    On *de novo* appeal to district court,[4] Staker again moved for pretrial suppression and dismissal on the asserted ground that the warrantless use of an undercover officer to induce his response to the false internet ad and ensuing text message conversation with "Lily" violated his right to privacy under Article II, Sections 10-11.[5] However, the District Court denied the motions, concluding that Staker's asserted subjective expectation, that the text messages he sent to "Lily" were and would remain private, was not objectively reasonable under the circumstances. Staker subsequently entered a conditional guilty plea reserving the right to appeal the denials of his motions to suppress and dismiss. After sentencing, he timely appealed.

**STANDARD OF REVIEW**

¶7    We review the denial of motions to suppress evidence and for dismissal of a criminal charge to determine whether any requisite findings of fact are clearly erroneous, and *de*

---

[4] The Gallatin County Justice Court is not a "court of record," as defined and referenced in § 3-10-101(5), -115, and -118, MCA. Trial *de novo* is the manner of appeal upon appeal to district court from a justice court that is not a "court of record." Section 46-17-311(1), MCA.

[5] The substantive affirmative defense of entrapment was not at issue.

4

*novo* as to whether the lower court correctly interpreted and applied the governing law. *State v. Conley*, 2018 MT 83, ¶ 9, 391 Mont. 164, 415 P.3d 473; *State v. Allen*, 2010 MT 214, ¶ 21, 357 Mont. 495, 241 P.3d 1045; *State v. Goetz*, 2008 MT 296, ¶ 9, 345 Mont. 421, 191 P.3d 489. Here, the stipulated facts are not in dispute—the narrow issue is whether the District Court correctly interpreted and applied the governing law.

**DISCUSSION**

¶8 Individuals have a fundamental Montana constitutional right to privacy, subject to government infringement only upon "showing of a compelling state interest." Mont. Const. art. II, § 10. In general, privacy is the "ability to control access to information about oneself." *State v. Hyem*, 193 Mont. 51, 62, 630 P.2d 202, 209 (1981) (citing Charles Fried, *Privacy*, 77 Yale L.J. 475, 482-83 (1968)), *overruled on other grounds by State v. Long*, 216 Mont. 65, 68-69, 700 P.2d 153, 156 (1985). Individuals also have a separate but corresponding Montana constitutional right to be free from "unreasonable searches and seizures." Mont. Const. art. II, § 11. As implementation of its substantive reasonableness requirement, Article II, Section 11 includes a procedural warrant requirement specifying that "[n]o warrant to search any place, or seize any person or thing shall issue without . . . probable cause[] supported by [written] oath or affirmation." Mont. Const. art. II, § 11.

¶9 The fundamental purpose of Article II, Sections 10-11 is "to protect the privacy and security of individuals from unreasonable government intrusion or interference." *State v. Hoover*, 2017 MT 236, ¶ 14, 388 Mont. 533, 402 P.3d 1224 (internal citation and

5

punctuation omitted).[6]  Together, Article II, Sections 10-11 provide a heightened state right to privacy, broader where applicable than the privacy protection provided under the Fourth and Fourteenth Amendments to the United States Constitution.  *Goetz*, ¶¶ 13-14 (citing *State v. Hardaway*, 2001 MT 252, ¶¶ 32 and 35, 307 Mont. 139, 36 P.3d 900; *State v. Solis*, 214 Mont. 310, 316, 693 P.2d 518, 521 (1984) (finding greater Montana right to privacy based on express recognition of a specific right to privacy in Article II, Section 10).  "When analyzing search and seizure questions that specifically implicate the right of privacy," we thus analyze and apply Article II, Sections 10-11 in tandem.  *Hardaway*, ¶ 32.  *See also State v. Smith*, 2004 MT 234, ¶¶ 9-13, 322 Mont. 466, 97 P.3d 567 (Article II, § 10 right to individual privacy augments § 11 right to be free from unreasonable searches and seizures); *Solis*, 214 Mont. at 319, 693 P.2d at 522 ("[t]he right to privacy is the cornerstone of" the "protection[] against unreasonable searches and seizures").

A.  **Extent of Montana Right to Privacy and Trigger of Protection Against Unreasonable Search and Seizure in Particular Cases**.

¶10     Under Article II, Section 10, a right to privacy exists only to the extent that an individual has or had a reasonable expectation of privacy under the totality of the circumstances at issue.  *Raap v. Bd. of Trustees, Wolf Point Sch. Dist.*, 2018 MT 58, ¶ 11, 391 Mont. 12, 414 P.3d 788; *Solis*, 214 Mont. at 314, 693 P.2d at 520; *Missoulian, Inc. v.*

---

[6] Article II, Sections 10-11 protect individuals from government action only and do not apply to the acts of private individuals not acting as government agents.  *State v. Wolfe*, 2020 MT 260, ¶ 10, 401 Mont. 511, 474 P.3d 318; *State v. Malkuch*, 2007 MT 60, ¶¶ 12-14, 336 Mont. 219, 154 P.3d 558; *Long*, 216 Mont. at 67-71, 700 P.2d at 155-57.

*Bd. of Regents*, 207 Mont. 513, 522, 675 P.2d 962, 967 (1984); *Montana Hum. Rts. Div. v. City of Billings*, 199 Mont. 434, 442, 649 P.2d 1283, 1287 (1982) (adopting threshold Fourth Amendment "search" criteria from *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 421, 542 (1967)[7] as the threshold privacy test under Article II, Section 10). The Article II, Section 11 right to be free from unreasonable searches and seizures similarly applies only to constitutional "searches" or "seizures." *State v. Boyer*, 2002 MT 33, ¶¶ 18 and 20, 308 Mont. 276, 42 P.3d 771; *State v. Bullock*, 272 Mont. 361, 377, 901 P.2d 61, 71 (1995). A constitutional "search" occurs where government action intrudes or infringes upon an individual's reasonable expectation of privacy. *State v. Stewart*, 2012 MT 317 ¶¶ 33-34, 367 Mont. 503, 291 P.3d 1187; *Allen*, ¶¶ 47-61; *Goetz*, ¶¶ 25 and 27-37; *State v. Tackitt*, 2003 MT 81, ¶ 17, 315 Mont. 59, 67 P.3d 295; *Boyer*, ¶ 20; *Hardaway*, ¶ 16; *State v. Scheetz*, 286 Mont. 41, 46, 950 P.2d 722, 726 (1997); *State v. Loh*, 275 Mont. 460, 468, 914 P.2d 592, 597 (1996) (quoting *Horton v. California*, 496 U.S. 128, 133-34, 110 S. Ct. 2301, 2306 (1990));[8] *Bullock*, 272 Mont. at 377, 901 P.2d at 71; *State v. Bennett*, 205

---

[7] The now-canon two-part reasonable expectation of privacy test generally referred to as the *Katz* test was actually first-enunciated in a concurring opinion construing the essence of the majority opinion analysis. *See Katz*, 389 U.S. at 360-61, 88 S. Ct. at 516 (Harlan, J., concurring). *Compare Katz*, 389 U.S. at 352-59, 88 S. Ct. at 512-15 (warrantless electronic monitoring of statements made in a public phone booth infringed upon the "justif[ed] reli[ance]" of the subject in the privacy of those statements and did not fall within any recognized exception to the Fourth Amendment warrant requirement). Subsequent Supreme Court decisions recognized Justice Harlan's formulation as the threshold Fourth Amendment test. *See Oliver v. United States*, 466 U.S. 170, 177-81, 104 S. Ct. 1735, 1740-42 (1984) (noting post-*Katz* displacement of former open fields/curtilage analysis); *Smith v. Maryland,* 442 U.S. 735, 740-41, 99 S. Ct. 2577, 2580 (1979).

[8] In contrast, a constitutional "seizure" occurs when government action "deprives [an] individual of dominion over his or her person or property." *Loh*, 275 Mont. at 468, 914 P.2d at 597 (quoting *Horton*, 496 U.S. at 133, 110 S. Ct. at 2306).

Mont. 117, 121, 666 P.2d 747, 749 (1983) (applying threshold Fourth Amendment "search" test from *Katz* as threshold "search" test under Article II, Section 11), *overruled on other grounds by Bullock*, 272 Mont. at 384, 901 P.2d at 76; *State v. Charvat*, 175 Mont. 267, 269-72, 573 P.2d 660, 661-63 (1978) (applying *Katz* test as threshold "search" test under Article II, Section 11), *overruled on other grounds by Bullock*, 272 Mont. at 384, 901 P.2d at 75-76.[9]

¶11    For purposes of Article II, Sections 10-11, a reasonable expectation of privacy exists only to the extent that an individual has a subjective expectation of privacy that is

_____

[9] Based on the similar text of the Fourth Amendment (*i.e.* federal "right . . . to be secure in their persons, houses, papers, and effects" from unreasonable searches and seizures) and Article II, Section 11 (right of individuals to "be secure in their persons, papers, homes and effects"), the scope of a federal or Montana constitutional "search" includes both physical trespasses by the government of, or upon, the persons, homes, and personal property of individuals *as well as* other government intrusions upon, or invasions of, an individual's reasonable expectation of privacy. *See Stewart*, ¶ 34 (noting that *Katz* reasonable expectation of privacy test applicable under Article II, Section 11 "is not the 'exclusive' test for determining whether a search has occurred"—it merely "augmented but did not displace or diminish" the preexisting textual "'trespassory' search" test— citing *United States v. Jones*, 565 U.S. 400, 406-07 and 410-11, 132 S. Ct. 945, 950-51 and 53 (2012) (noting *Katz* reasonable expectation of privacy test merely recognizes that the scope of the Fourth Amendment privacy protection includes not only the express protections against physical intrusions or trespasses into or upon the "persons, houses, papers, and effects," but also intrusions upon or infringement of a reasonable expectation of privacy)); *Katz*, 389 U.S. at 350-53, 88 S. Ct. at 510-11 ("Fourth Amendment . . . protects individual privacy against certain kinds of . . . intrusion, but its protections go further, and often have nothing to do with privacy at all. . . . [it] governs not only the seizure of tangible items, but extends as well to . . . [other matters] without any 'technical trespass' . . . [it] protects people—and not simply 'areas' . . . [its] reach cannot [merely] turn upon the presence or absence of a physical intrusion into any given enclosure . . . [the previously enunciated] 'trespass doctrine' . . . [is] no longer . . . controlling"). *See also Bullock*, 272 Mont. at 373-84, 901 P.2d at 69-76 (holding that the scope of constitutionally protected privacy interests in areas beyond the curtilage of a home under the *Katz* reasonable expectation of privacy test, as applied under Article II, Sections 10-11, may be broader under the circumstances than under the pre-*Katz* curtilage/open fields doctrine applicable under the express "persons, houses, papers, and effects" language of the Fourth Amendment).

objectively reasonable in society. *Stewart*, ¶¶ 33-34; *Allen*, ¶¶ 47-61; *Goetz*, ¶¶ 27-37; *Boyer*, ¶ 20; *Scheetz*, 286 Mont. at 48, 950 P.2d at 726; *Bullock*, 272 Mont. at 375, 901 P.2d at 70 (citing *Katz*, 389 U.S. at 361, 88 S. Ct. at 516 (Harlan, J., concurring)); *Solis*, 214 Mont. at 314, 693 P.2d at 520; *Missoulian*, 207 Mont. at 522, 675 P.2d at 967; *Montana Hum. Rts. Div.*, 199 Mont. at 442, 649 P.2d 1287. Whether an individual had a subjective expectation of privacy, and whether such expectation was objectively reasonable in society, are mixed questions of fact and law under the totality of the circumstances of each case. *Raap*, ¶ 12 (citing *Moe v. Butte-Silver Bow Cty.*, 2016 MT 103, ¶ 19, 383 Mont. 297, 371 P.3d 415); *Scheetz*, 286 Mont. at 48, 950 P.2d at 726 (noting that assessment of an expectation of privacy depends on various factors).[10] Absent a reasonable expectation of privacy, there is no constitutional intrusion, search, or seizure under Article II, Sections 10-11. *Allen*, ¶ 47; *State v. Elison*, 2000 MT 288, ¶ 48, 302 Mont. 228, 14 P.3d 456; *Hulse v. Mont. Dept of Justice, Motor Veh. Div.*, 1998 MT 108, ¶ 22, 289 Mont. 1, 961 P.2d 75 (citing *Scheetz*, 286 Mont. at 41, 950 P.2d at 724). Even in the presence of a reasonable expectation of privacy, whether a constitutional intrusion or search occurred ultimately depends on whether, based on the nature of the intrusion, the government action substantially infringed or intruded upon the reasonable expectation of privacy. *Harris v. Smartt*, 2002 MT 239, ¶¶ 64-69, 311 Mont. 507, 57 P.3d 58 (whether "an unlawful

---

[10] *See also Rawlings v. Kentucky*, 448 U.S. 98, 104-05, 100 S. Ct. 2556 (1980); *United States v. Kovac*, 795 F.2d 1509, 1510 (9th Cir. 1986).

government intrusion into one's privacy" has occurred depends on "whether the person has an actual expectation of privacy . . . whether society is willing to recognize that expectation as objectively reasonable[] and . . . the nature of the state's intrusion"—"[i]rrespective of whether . . . any expectation of privacy [existed] with regard to the images on the computer screen, the nature of the intrusions did not rise to the level of a search"); *Scheetz,* 286 Mont. at 48-51, 950 P.2d at 726-28 ("to determine what constitutes a search pursuant to Article II, Section 11" depends on "two separate factors . . . the extent of the privacy expectation[] and . . . the nature of the state's intrusion"); *State v. Siegal*, 281 Mont. 250, 265-75, 934 P.2d 176, 184-91 (1997) (considering nature of the intrusion as a pertinent factor in assessing reasonableness of expectation of privacy and whether a constitutional search occurred), *overruled on other grounds by State v. Kuneff*, 1998 MT 287, ¶ 19, 291 Mont. 474, 970 P.2d 556.[11]

### B.  Compelling Government Interest and Constitutional Reasonableness.

---

[11] *See similarly, e.g., State v. Dunn*, 2007 MT 296, ¶¶ 12-17, 340 Mont. 31, 172 P.3d 110 (whether "a search violated the Montana Constitution" depends on "two factors . . . whether the person has an actual expectation of privacy that society is willing to recognize as objectively reasonable[] and . . . the nature of the state's intrusion"—internal punctuation and citation omitted); *State v. Hamilton*, 2003 MT 71, ¶ 17, 314 Mont. 507, 67 P.3d 871 ("[w]hether an individual's right to privacy . . . [under] the Montana Constitution has been infringed by an unlawful search depends on whether there has been a government intrusion into an area subject to a reasonable expectation of privacy . . . [a] search occurs when the government infringes upon an individual's expectation of privacy that society considers objectively reasonable"—citing *Scheetz*); *State v. Bassett*, 1999 MT 109, ¶ 24, 294 Mont. 327, 982 P.2d 410 (indirectly citing *Scheetz*); *State v. Hubbel*, 286 Mont. 200, 208-10, 951 P.2d 971, 975-77 (1997) ("whether there has been an unlawful search pursuant to Montana's constitution" depends on "two factors . . . whether the person has an actual expectation of privacy that society is willing to recognize as objectively reasonable[] and . . . the nature of the state's intrusion – citing *Scheetz*). *See also Boyer*, ¶ 20 (citing *Bassett*).

¶12 Upon determination of a constitutional search or seizure triggering the protection of Article II, Sections 10-11,[12] the next questions are whether it was both narrowly tailored to further a compelling state interest as required by Article II, Section 10, and constitutionally reasonable as required by Article II, Section 11. *See* Mont. Const. art. II, §§ 10-11; *Allen*, ¶¶ 47, 62, and 64; *Goetz*, ¶¶ 26-27 and 38-40; *Tackitt*, ¶¶ 17 and 23 (citing *Scheetz*, 286 Mont. at 50, 950 P.2d at 727). While the State generally has a compelling interest in "enforc[ing] its criminal laws for the benefit and protection of other fundamental rights of its citizens," *Elison*, ¶ 53; *Solis*, 214 Mont. at 319, 693 P.2d at 522,[13] warrantless searches and seizures must be narrowly tailored to serve the particular compelling state interest at

---

[12] References herein to a "constitutional search" or "constitutional seizure" do not connote or equate with a characterization of the subject government action as a constitutionally *permissive* search or seizure. They are, rather, merely shorthand references to the threshold question of whether the subject government action constituted or qualified as a "search" or "seizure" as expressly referenced in the Fourth Amendment and Article II, Section 11, and, if so, thus triggering the next question in the analysis as to whether the subject search or seizure was constitutionally permissible under the substantive and procedural safeguards respectively provided by or derived from those federal and state constitutional provisions. If not, the constitutional search or seizure analysis ends because the subject government action was, as a threshold matter, not of a type subject to and governed by the Fourth Amendment or Article II, Section 11.

[13] "Depending upon the circumstances, [the] 'compelling state interest'" required by Article II, Section 10 "may be the recognition or furtherance of a competing state or federal constitutional right, a statutory right or duty, or []other government interest." *City of Bozeman v. McCarthy*, 2019 MT 209, ¶ 17, 397 Mont. 134, 447 P.3d 1048 (citing *Missoula Cty. Pub. Schs.*, ¶ 11 (balancing right to privacy with public right to know)); *Burns*, 253 Mont. at 40-41, 830 P.2d at 1320-21 (balancing right to privacy with state interest in enforcement of criminal law); *Mont. Human Rights Div.*, 199 Mont. at 444, 649 P.2d at 1288 (balancing right to privacy with state constitutional right to equal protection and related state interest in enforcing Montana Human Rights Act). *See also Great Falls Tribune v. Eighth Judicial Dist. Ct.*, 186 Mont. 433, 437-39, 608 P.2d 116, 119 (1980) (balancing public right to know with federal and state constitutional rights of criminal defendants to speedy, fair, and impartial trials).

issue under the circumstances of each case. *Allen*, ¶¶ 47, 62, and 65; *Goetz*, ¶¶ 26-27 and 38-40; *State v. Hamilton*, 2003 MT 71, ¶¶ 37-43, 314 Mont. 507, 67 P.3d 871; *Tackitt*, ¶¶ 17 and 23 (citing *Scheetz*, 286 Mont. at 50, 950 P.2d at 727). Thus, based on the heightened individual right to privacy under Article II, Section 10, the government must generally utilize the least intrusive means available to effect a warrantless search under a recognized exception to the warrant requirement of Article II, Section 11. *State v. Sierra*, 214 Mont. 472, 476-78, 692 P.2d 1273, 1275-78 (1985), *overruled on other grounds by State v. Pastos*, 269 Mont. 43, 57, 887 P.2d 199, 208 (1994). *See also Pastos*, 269 Mont. at 57, 887 P.2d at 208 (finding routine booking inventory search exception narrowly tailored to further compelling state interest in protection of persons and safe jail administration); *Siegal*, 281 Mont. at 278, 934 P.2d at 192 (mere showing of compelling state interest in criminal law enforcement insufficient alone).

¶13 Upon a showing under Article II, Section 10 that the subject search or seizure was narrowly tailored to further a compelling state interest, "the State may [still] not invade an individual's privacy" unless the search or seizure is constitutionally reasonable under Article II, Section 11. *Goetz*, ¶ 26 (quoting *Elison*, ¶ 53); *Scheetz*, 286 Mont. at 50, 950 P.2d at 727 (substantial intrusion into reasonable expectation of privacy "requires further justification, such as a warrant or other special circumstances."). In that regard, searches and seizures authorized by judicial warrant, on probable cause of illegal activity and particularly describing the object of the search or seizure, are presumed reasonable under the Fourth and Fourteenth Amendments to the United States Constitution and Article II,

Section 11 of the Montana Constitution. *See* Mont. Const. art. II, § 11; U.S. Const. amend. IV and XIV; *Walczyk v. Rio*, 496 F.3d 139, 155-56 (2d Cir. 2007). *See also State v. Sorenson*, 180 Mont. 269, 274-75, 590 P.2d 136, 140 (1979) (noting "high function" of warrant requirement as included procedural safeguard under right to be free from unreasonable searches and seizures), *overruled on other grounds by Loh*, 275 Mont. at 473, 914 P.2d at 600.[14] In contrast, warrantless searches and seizures are *per se* unreasonable, except as authorized under a recognized and well-defined exception to the respective warrant requirements of the Fourth Amendment and Article II, Section 11. *Allen*, ¶¶ 47 and 62; *Goetz*, ¶¶ 27 and 38-40; *Tackitt*, ¶¶ 23-24; *Hardaway*, ¶ 36; *Hubbell*, 286 Mont. at 212, 951 P.2d at 978; *Bullock*, 272 Mont. at 374, 901 P.2d at 70; *State v. Rushton*, 264 Mont. 248, 257, 870 P.2d 1355, 1361 (1994); *Katz*, 389 U.S. at 357, 88 S. Ct. at 514. Based on the heightened Montana constitutional right to privacy, "the range of warrantless searches" and seizures permissible under Article II, Sections 10-11 is narrower than the range permissible under the Fourth Amendment. *Hardaway*, ¶ 35; *Elison*, ¶ 46. Under the Montana Constitution, we thus assess the reasonableness of a constitutional search or seizure as a function of whether it occurred pursuant to a valid judicial warrant, issued on probable cause and particularly describing the area or person to be searched or seized, or whether it fell within one of the narrower range of recognized exceptions to the warrant

---

[14] *See also United States v. Torres*, 751 F.2d 875, 883 (7th Cir. 1984) (noting that a search pursuant to an otherwise valid warrant could conceivably still run afoul of substantive reasonableness requirement of Fourth Amendment).

13

requirement of Article II, Section 11. *See* Mont. Const. art. II, §§ 10-11; *Allen*, ¶¶ 47 and 62; *Goetz*, ¶¶ 27 and 38-40; *Tackitt*, ¶¶ 23-24; *Hubbell*, 286 Mont. at 212, 951 P.2d at 978—citing *Katz*, 389 U.S. at 357, 88 S. Ct. at 514); *State v. Rushton*, 264 Mont. 248, 257, 870 P.2d 1355, 1361 (1994). Based on the presumption of unreasonableness, the State bears the burden of demonstrating that a warrantless search or seizure was narrowly tailored to further a particular compelling government interest and accordingly fell within a recognized exception to the warrant requirement of Article II, Section 11. *Goetz*, ¶ 40.[15]

---

[15] We consider the nature of the subject government intrusion at two different stages of our search and seizure analysis. First, in assessing the threshold question of whether a constitutional intrusion or search occurred (*i.e.*, whether the subject action substantially intruded upon or infringed a reasonable expectation of privacy). *See Rogers v. Lewis & Clark Cty.*, 2020 MT 230, ¶¶ 23-27, 401 Mont. 228, 472 P.3d 171 (in re warrantless strip searches of arrestees without particularized suspicion on jail intake for minor offenses); *Montana Cannabis Indus. Ass'n v. State*, 2016 MT 44, ¶ 81, 382 Mont. 256, 368 P.3d 1131 (no reasonable expectation of privacy re warrantless statutorily-authorized administrative regulatory search of licensed medical marijuana facilities); *Harris*, ¶¶ 68-69 (staff entrance into private government office for a work-related purpose and resulting observation of images visible on computer screen not a privacy intrusion sufficiently substantial to constitute a search); *Boyer*, ¶¶ 24, 33, and 39-40, (privacy expectation in re hunting/fishing license checks, game/fish inspections, and related presence of law enforcement officer on boat transom); *Hardaway*, ¶¶ 15-23 (in re swabbing of blood evidence from hands incident to arrest for scientific analysis); *Elison*, ¶¶ 48-52 (expectation of privacy in context of an automobile search); *Hubbel*, 286 Mont. at 208 and 210-11, 951 P.2d at 976–78 (in re homeowner expectation of privacy in open driveway, walkway to porch, and porch beyond Fourth Amendment open-fields/curtilage analysis); *Bassett*, ¶¶ 24-45 (homeowner expectation of privacy in post-fire ruins of closet contents); *Scheetz*, 286 Mont. at 48 and 50, 950 P.2d at 726-28 (drug-dog sniff of checked airline luggage); *Bullock*, 272 Mont. 361, 384-85, 901 P.2d 61, 75-76 (landowner expectation of privacy in fenced and posted area on remote mountain cabin property beyond Fourth Amendment open-fields doctrine); *Siegal*, 281 Mont. at 275-78, 934 P.2d at 191-92 (recognizing warrantless thermal imaging of home as a constitutional search); *Solis*, 214 Mont. at 318, 693 P.2d at 522 (in re reasonable expectation of privacy in "face to face encounters in a private setting . . . that hidden monitoring is not taking place").

Then, upon threshold determination that a warrantless constitutional search or seizure occurred, we again consider the nature of the intrusion in assessing whether it was constitutionally reasonable as within a recognized exception to the warrant requirement of Article II, Section 11. *See Stewart*, ¶¶ 43-44 (in re state failure to meet burden of showing that warrantless monitoring of

14

## C. Application to Warrantless Prostitution Sting at Issue.

¶14 Here, focusing on the ubiquitous and personal nature of modern cell phone text messaging communications, Staker essentially asserts that the warrantless use of an undercover officer to induce his response and ensuing text message communications regarding the deceptive internet ad for sexual services violated his objectively reasonable expectation of privacy that he was not communicating with a cloaked government agent and that his text messages would thus remain private from warrantless government intrusion. Citing, *Stewart*, ¶¶ 6-11 and 40-44; *Allen*, ¶ 61; *Goetz*, ¶¶ 30, 37, and 54, he characterizes his illicit text message communications with the cloaked law enforcement officer as a form or analog of the illegal surreptitious electronic monitoring and recording by the government at issue in those cases, and thus similarly invasive and unreasonable

---

police-suggested "pretext phone calls" fell within recognized exception to the warrant requirement); *Allen*, ¶¶ 62-64 (in re state failure to meet burden of showing that warrantless electronic recording of telephone calls by police agent-informant fell within recognized exception to the warrant requirement); *Goetz*, ¶¶ 38-54 (warrantless electronic monitoring of face-to-face conversation by body-wire in private setting not justified under asserted consent and particularized suspicion exceptions); *Smith*, ¶¶ 13-17 (in re application of community caretaker doctrine exception); *Elison*, ¶¶ 53-58, (in re Montana automobile exception narrower than Fourth Amendment automobile exception); *State v. McLees*, 2000 MT 6, ¶¶ 15-34, 298 Mont. 15, 994 P.2d 683 (in re third-party common consent authorization exception to warrant requirement and independent source/inevitable discovery exceptions to exclusionary rule); *Siegal,* 281 Mont. at 275-78, 934 P.2d at 191-92 (in re warrantless thermal imaging of a home); *Loh*, 275 Mont. at 471-75, 914 P.2d at 599-60 (in re plain view exception); *State v. Sorenson*, 180 Mont. 269, 272-77, 590 P.2d 136, 139-41 (1979) (in re asserted Fourth Amendment plain view "hot pursuit," exigent circumstances, and consent exceptions), *overruled on other grounds by Loh*, 275 Mont. at 472-73, 914 P.2d at 599-600; *State v. Ulrich*, 187 Mont. 347, 350-54, 609 P.2d 1218, 1220-22 (1980) (in re gunshot residue swabbing/testing of hands under search incident to arrest exception, *overruled by Hardaway*, ¶ 57 (limiting Montana search incident to arrest exception to search for weapons, preservation of evidence, and prevention of escape absent exigent circumstances)).

given the particular concern of the Framers of the Montana Constitution that people be protected from surreptitious electronic monitoring and recording by modern technical means. He therefore asserts the District Court erroneously concluded he had no objectively reasonable expectation of privacy that he was not sending text messages to a government agent rather than the sex worker he thought "Lily" to be. We disagree.

(1) *State v. Goetz*.

¶15 At issue in *Goetz* were three seemingly private conversations between a confidential government informant and two suspected drug dealers, one each in the respective homes of the suspected dealers and another in the car of one of them while stopped in a parking lot, incident to which the informant purchased illegal methamphetamine from each with police-provided money. *Goetz*, ¶¶ 5 and 7. Unbeknownst to the suspected drug dealers, the purchaser was a confidential police informant outfitted with an electronic body-wire that clandestinely transmitted captured conversations for monitoring and recording by nearby police. *Goetz*, ¶¶ 5 and 7. Based on the undisputed facts that each of the monitored and recorded conversations were face-to-face conversations that took place in relatively private settings (*i.e.*, in the confines of the defendants' private homes and a private vehicle in a parking lot outside the presence and hearing of others), we held that the defendants each had subjective expectations of privacy that the government was not surreptitiously monitoring or recording the subject conversations by electronic means. *Goetz*, ¶ 30.

¶16 Noting the particular concern underlying Article II, Sections 10-11 that Montanans be protected from surreptitious electronic eavesdropping, surveillance, monitoring, and

16

recording by law enforcement in circumstantially private settings, and that the illegal nature or purpose of the subject conduct had no bearing on whether it occurred in a private setting, we further concluded that the subjective expectations that the government was not electronically monitoring and recording those conversations were objectively reasonable under the circumstances. *Goetz*, ¶¶ 31-37. Turning to the reasonableness requirement of Article II, Section 11, we ultimately held that the warrantless electronic monitoring and recording was constitutionally unreasonable due to the State's failure to meet its burden of demonstrating that it was justified under any recognized exception to the warrant requirement of Article II, Section 11. *Goetz*, ¶¶ 38-54 (rejecting state assertion of compliance with consent exception based on one-party consent and declining to recognize a new exception for warrantless electronic monitoring/recording of private conversations on particularized suspicion of illegal activity).

(2) *State v. Allen*.

¶17 At issue in *Allen* were a number of private cell phone conversations between the defendant, who was initially the subject of a law enforcement drug investigation and who later committed two drug-related assaults with a gun, and a female friend who, unbeknownst to him, was a police informant. *Allen*, ¶¶ 7 and 9. Further unbeknownst to the defendant, the female friend/informant was secretly recording their seemingly private phone conversations at the behest of the police without a search warrant under circumstances indicating to the defendant that no one else could hear or was recording them. *Allen*, ¶ 9. After the district court denied the defendant's motion for suppression of

17

the warrantless recordings pursuant to Article II, Sections 10-11 and *Goetz*, the jury found the defendant guilty of several felonies, based largely on the secret telephone recordings. *Allen*, ¶ 18. On review of the suppression ruling on appeal, we first critically reviewed a line of our prior decisions between 1980 and 2008 wherein we upheld warrantless electronic monitoring of telephone conversations with one-party consent, as distinct from warrantless recording of face-to-face conversations in private settings, on the ground that the subjects had no reasonable expectation of privacy that the other party to a seemingly private telephone conversation was not a police informant or otherwise allowing police to monitor or record the conversations. *Allen*, ¶¶ 35-43. Finding our analyses in those prior cases "weak" and "wanting" in light of *Goetz*, we "address[ed] anew whether the surreptitious" warrantless electronic monitoring or recording of "telephone conversation[s]" violates Article II, Section 10-11. *Allen*, ¶¶ 44-46.

¶18    As to Allen in particular, we noted the undisputed facts that: (1) he was not aware that his friend was a police informant; (2) he further had no reason to believe that she was "using the speaker phone function on her [cell] phone" or that anyone else was listening or could hear the conversation; (3) his constant movement while speaking on the phone precluded others from hearing anything but snippets of his side of the conversations; and (4) he only guardedly "convey[ed] [limited] information about the topic[]" of the conversations. *Allen*, ¶¶ 49 and 51. Under those circumstances, we held that Allen had a subjective expectation of privacy that the subject telephone conversations with his friend were private to them and "not being surreptitiously recorded by a police informant." *Allen*,

18

¶ 49. We next noted the particular focus of the Framers of the Montana Constitution to protect people from surreptitious electronic eavesdropping, surveillance, monitoring, and recording by government agents in circumstantially private settings and the "vital role" the telephone, including the "ubiquitous" cell phone, "has come to play" "in private communications." *Allen*, ¶¶ 52-61. Based on those considerations, we held that Allen's subjective expectation of privacy that a government agent was not monitoring or recording "his cell-phone conversation[s]" with his friend was objectively reasonable, and that the recordings thus constituted constitutional searches triggering the protections of Article II, Sections 10-11. *Allen*, ¶ 61. Turning to the reasonableness requirement of Article II, Section 11, we ultimately held, as in *Goetz*, that the warrantless surreptitious electronic recording of the subject cell phone conversations were constitutionally unreasonable because they were not justified under the narrow requirements of the recognized consensual search exception, or any other recognized exception to the warrant requirement of Article II, Section 11. *Allen*, ¶¶ 62-64 (again rejecting state assertion one-party consent was sufficient under the consent exception).

(3) *State v. Stewart*.

¶19 At issue in *Stewart* were a number of telephone conversations between the defendant father and his adult daughter wherein she alleged that he previously sexually molested her over an 11-year period, starting at seven years-old. *Stewart*, ¶¶ 2 and 6. Upon previously reporting the alleged abuse to police after leaving home at age 18, the daughter agreed, at the behest of the investigating police detective, to make a number of "pretext

19

phone calls" to her father, for the purpose of eliciting incriminating statements from him without knowledge that police were secretly monitoring and recording the calls. *Stewart*, ¶ 6. Without a search warrant, the detective went to the daughter's home where he "connected his listening and recording equipment to [her] landline." *Stewart*, ¶ 6. He then electronically monitored and recorded three calls made by the daughter to her father's cell phone while he was traveling with his wife (to whom he referred in one of the calls as her "mom"), and a return call from him continuing the first conversation after he stopped at a gas station. *Stewart*, ¶¶ 6-11. The State later played the recordings of the pretext calls to the jury at trial without objection from the defendant. *Stewart*, ¶ 19. After the jury returned guilty verdicts on the charged sexual offenses, the father moved for a new trial pursuant to *Allen* on the assertion that the warrantless surreptitious government recording of the incriminating phone conversations violated his right to privacy under Article II, Sections 10-11. *Stewart*, ¶¶ 20-21. The district court denied the motion, however, on the stated ground, *inter alia*, that the father had no subjective expectation of privacy in non-disclosure of the substance of the calls because his wife was present in his car with him during most of the calls and that he contemporaneously admitted to her that he performed oral sex on the daughter on one of the various occasions at issue. *Stewart*, ¶ 22.

¶20 Upon consideration of whether the district court correctly concluded that the father had no subjective expectation of privacy in non-disclosure of the substance of the calls under the circumstances, we first emphasized the importance of precisely "identify[ing] the specific privacy expectation at issue" in a particular case. *Stewart*, ¶¶ 35-38. In that

20

regard, we noted that the pertinent focus was on the Father's expectation that *the government* was not electronically monitoring or recording the conversations, not whether others may have overheard snippets and repeated them. *Stewart*, ¶¶ 38-39 (noting that only the surreptitious *recordings* in *Allen* were constitutionally tainted rather than the informant's testimony as to what was said—citing *Allen*, ¶¶ 49 and 65 n.2). We thus recognized that the presence of the Father's wife while he spoke with his daughter on the phone, and his contemporaneous admission to her of a particular instance of sexual activity with the daughter, "did not automatically vitiate [his] expectation of privacy" that *the government* was not surreptitiously monitoring or recording the phone conversations with the daughter. *Stewart*, ¶ 39 (internal punctuation omitted). Based on the totality of the pertinent circumstances (*i.e.* telephone conversations in the confines of the father's vehicle, no one in earshot except for his wife, Caller ID verification that daughter was speaking from "the landline at the family's residence," and no reason to believe that anyone else was listening-in or recording the conversation), we held that the father had a subjective expectation of privacy that the subject phone calls were "not being surreptitiously [monitored or] recorded by police"—not that his wife or daughter would not subsequently repeat what they heard. *Stewart*, ¶ 40. As in *Allen* and *Goetz*, we ultimately held that: (1) the Father's subjective expectation of privacy was objectively reasonable under the circumstances; (2) the government's electronic monitoring and recording of the calls substantially infringed that reasonable expectation and were thus constitutional searches; and (3) the warrantless searches were constitutionally unreasonable due to the State's

21

failure to demonstrate that they were justified under a recognized exception to the warrant requirement of Article II, Section 11. *Stewart*, ¶¶ 41-43.

(4) *Staker's Subjective Expectation of Privacy*.

¶21 Whether and to what extent an individual has a subjective expectation of privacy is generally a question of fact under the totality of the circumstances of each case. *Stewart*, ¶ 40; *Goetz*, ¶ 29 (citing *Scheetz*, 286 Mont. at 48, 950 P.2d at 726-27). Relevant considerations include the nature and circumstances of the location and setting at issue and the extent to which the subject overtly or implicitly assumed, considered, desired, or endeavored to ensure that the subject activity or information would remain concealed or undisclosed to others. *See Stewart*, ¶ 40; *Allen*, ¶¶ 48-51; *Goetz*, ¶¶ 28-30 (citing *Elison*, ¶ 51, *inter alia*). *See also State v. Dess*, 201 Mont. 456, 464, 655 P.2d 149, 153 (1982) (existence or non-existence of the right to exclude others may also be relevant to the existence and objective reasonableness of a subjective expectation). Even in an otherwise private setting, an individual generally has no expectation of privacy to the extent that he or she knowingly exposes something to others. *See Scheetz,* 286 Mont. at 48-49, 950 P.2d at 726-27 (citing *Katz*, 389 U.S. at 351-52, 88 S. Ct. at 511). However, even in an otherwise public setting, a person may have a subjective expectation of privacy to the extent that the person endeavors to conceal the subject activity or information from the others at issue. *See Scheetz*, 286 Mont. at 48-49, 950 P.2d at 726-27 (citing *Katz*, 389 U.S. at 351-52, 88 S. Ct. at 511). In either event, the pertinent focus is on the "specific privacy expectation at

issue," whether that be from government intrusion or concealment from others. *See Stewart*, ¶¶ 38-39 (citing *Allen*, ¶¶ 49 and 65 n.2).

¶22    Here, by text message sent from his cell phone, Staker knowingly and voluntarily engaged in a text message conversation with a purported sex worker known to him only as "Lily" for the purpose of negotiating and consummating a commercial transaction for sex. Based on the point-to-point nature and common understanding of cell phone text messaging, he had no reason to suspect that anyone other than a sex worker named "Lily" was a party to or was otherwise receiving, monitoring, or intercepting his text messages. Based on the illegal nature of the transaction, the furtive substance, tone, and manner of the conversation, and his circumstantial trust and belief, however objectively imprudent, that he was privately communicating with a sex worker as advertised, we agree that Staker had a subjective expectation of privacy that he was indeed texting with a sex worker regarding an illicit sexual transaction, all of which he believed that "she" would likely keep private between them.

(5)  *Objective Reasonableness of Staker's Subjective Expectation*.

¶23    In cases involving warrantless searches by means of surreptitious electronic monitoring or recording means, our assessment of the objective reasonableness of a subjective expectation of privacy begins with recognition that protection from surreptitious government monitoring and recording by modern electronic means in otherwise private settings was a major concern underlying the unprecedented heightened privacy protection

23

enshrined in Article II, Section 10 to further enhance the preexisting search and seizure protection carried forward in Article II, Section 11,[16] to wit:

> We have on prior occasions . . . [noted] the debates of [] the delegates to the constitutional convention with regard to the inclusion of the right to privacy in the 1972 Montana Constitution. . . .  Delegate Campbell stated that "the [Bill of Rights] committee felt very strongly that the people of Montana should be protected as much as possible against *eavesdropping, electronic surveillance, and such type of activities*. . . [W]e found that the citizens of Montana were very suspicious of such type of activity." Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, p. 1682. Delegate Dahood reported even more strongly: "[I]t is inconceivable to any of us that there would ever exist a situation in the State of Montana where electronic surveillance could be justified. . . [W]ithin the area of the State of Montana, we cannot conceive of a situation where we could ever permit electronic surveillance." *Transcript*, p. 1687. Thus, the Constitutional Convention delegates were aware of the great value Montana citizens place on the right to privacy and the clear risk to that privacy engendered *by the existence and advancement of electronic technology as used by law enforcement*.
>
> [T]he proceedings of the 1972 Montana Constitutional Convention disclose on the part of the delegates a particular concern over the *intrusion* of the government into the privacy of Montanans *through the use of various types of electronic monitoring and surveillance*. . . .
>
> > [I]t is clear that the delegates' concerns encompassed the invasion of citizens' privacy without their knowledge by means of various sorts of *electronic audio and visual monitoring and surveillance equipment*.  Not only were the delegates wary of existing technology of this type, but they recognized that this sort of technology would continue to be refined and would become more widespread and easily available.  In this regard their concerns have been well-founded.  Moreover, it is also clear that, in the delegates' view, the use of this sort of technology should be justified only in the most serious of situations, involving heinous crimes

---

[16] *See* 1889 Mont. Const. art. III, § 7.

> where it is necessary to "risk the right of individual privacy
> because there is a greater purpose to be served." . . .
>
> The express statements of the delegates to the 1972 Montana Constitutional
> Convention regarding the government's use of electronic surveillance
> against Montana's citizens provide direct support for a conclusion that
> society is willing to recognize as *reasonable the expectation that
> conversations held in a private setting are not surreptitiously being
> electronically monitored and recorded by government agents*. We are
> convinced that Montanans continue to cherish the privacy guaranteed them
> by Montana's Constitution.

*Goetz*, ¶¶ 33-35 (citing and quoting *Siegal*, 281 Mont. at 265 and 276-77, 934 P.2d at 184

and 191-92) (emphasis added). We have further recognized that the reasonable expectation

in Montana that people "are not surreptitiously being electronically monitored and recorded

by government agents" in private settings is generally not diminished by the illegal nature

of their activities or communications. *Goetz*, ¶ 36 (citation omitted). In other words, for

purposes of Article II, Sections 10-11, the illegal nature of the subject matter or conduct at

issue is not determinative of whether a subjective expectation of privacy was or is

objectively reasonable under the totality of the circumstances. *See Goetz*, ¶ 32; *State v.

Fourth Judicial Dist. Ct.*, 70 Mont. 202, 208, 224 P. 866, 869 (1924) ("exercise of the

power of search and seizure is absolutely essential to the public welfare" but "the process

[must] be exercised, and the law enforced and vindicated, without transgressing those

constitutional [guarantees] which are provided for all alike, the guiltless and the guilty").[17]

---

[17] *Accord United States v. Fields*, 113 F.3d 313, 321 (2d Cir. 1997) (the reasonableness of
"[p]rivacy expectations do[es] not hinge on the nature of defendant's activities—innocent or
criminal. . . . In fact, many Fourth Amendment issues arise precisely because the defendants were
engaged in illegal activity on the premises for which they claim privacy interests."); *United States
v. Taborda*, 635 F.2d 131, 139 n.10 (2d Cir. 1980) ("the reasonableness of an expectation of

Consequently, regardless of the illegal nature of the subject activity or communication, Montanans generally have a reasonable expectation of privacy that the government or government agents are not surreptitiously monitoring or recording their conversations and activities in their homes and other private settings by electronic means. *Allen*, ¶¶ 57 and 61; *Goetz*, ¶¶ 35 and 37.

¶24 In contrast, however, it is not objectively reasonable in society for people to reliably expect that persons to whom they are speaking, or to whom they otherwise expose their conduct or activities, will not repeat or report what they have heard or seen to others, including law enforcement. *See Goetz*, ¶ 35. Here, unlike in *Stewart*, *Allen*, and *Goetz*, this case does not involve any form of government monitoring or recording of a seemingly private conversation between people by separate surreptitious electronic means. Rather, this case involves the modern analog of the exchange of paper correspondence or notes by traditional mail or courier service by one with another who in fact may or may not be the person who the sender believes them to be.[18] The only difference here is that, unlike the

---

privacy [is not] logically dependent . . . on the degree of culpability of the activity, but on the degree to which the locale is viewable by a member of the public without visual aids").

[18] Text messaging is a method of written electronic communication involving point-to-point transmission of alpha-numeric characters and/or embedded images, in the form of digital data packets or files generated on the sender's device, between cell phones and/or personal computers via a short message service (SMS) generally provided by cell phone network providers. Jennifer Hord, *How SMS Works*, howstuffworks.com, https://computer.howstuffworks.com/e-mail-messaging/sms.htm (Updated May 12, 2021) ("SMS is a store-and-forward service, . . . when you send a text message . . ., the message does not go directly to [the recipient's] cell phone. . . [it] is stored in the . . . SMSC [network] until [the recipient's phone is] on or moves into range, at which point [it] is delivered [to the recipient's phone]. The message . . . [then] remain[s] stored on [the recipient's cell phone] SIM card until . . . delete[d]."). Except to the extent a copy is stored in the

traditional paper exchange by mail or courier service, the communication exchange took place via point-to-point messages electronically transmitted from one to the other by and between their respective cellular phones or devices over a modern cellular telephone network. Unlike in *Stewart*, *Allen*, and *Goetz*, the government or a government agent did not surreptitiously intercept, listen-in, surveil, or record the subject communications exchange by separate electronic means as feared by the Framers of our Constitution. The involved government agent was merely the recipient, based on old-world subterfuge and misplaced trust, of text messages (*i.e.*, digital information packets or files) knowingly and voluntarily sent by Staker to a specific cell phone number purportedly belonging to a sex worker known only as "Lily." Consequently, our holdings in *Stewart*, *Allen*, and *Goetz* are factually and legally distinguishable here.

¶25 Stripped of the incompatible and false comparison to surreptitious government monitoring and recording of face-to-face and telephone communications by separate electronic means, the residue of Staker's assertion of error is that, based on the ubiquitous and increasingly essential nature of cell phone text messaging as a means of interpersonal communication in the modern world, Montanans have or should have an objectively reasonable expectation that the intended recipient of a cell phone text message is indeed the person the recipient purports or is purported to be—not a government agent. However, in contrast to the particular concern of the Framers of our Constitution—that people be

---

SMSC network, text messages are thus the modern analog of written notes or correspondence mailed or otherwise delivered to an intended recipient.

protected from government monitoring and recording in private settings by surreptitious electronic means—we are aware of no similar Framers' concern and desire to provide special constitutional protection from the traditional and longstanding use of undercover government agents to otherwise lawfully gain the trust of others in mutually consensual discourse and conduct in furtherance of the government's compelling interest in detection and prosecution of illegal activity. We essentially held to the contrary just six years after voter ratification of our new Constitution. *See State v. Leighty*, 179 Mont. 366, 369, 588 P.2d 526, 528 (1978).

¶26　In *Leighty*, without a search warrant, Montana Fish and Game officers used an out-of-state resident as an "undercover agent" to telephone a suspended Montana hunting outfitter to arrange a guided bear hunt in Montana in order "to test" the outfitter's prior statement to a Fish and Game officer of his intent to defy the license suspension. *Leighty*, 179 Mont. at 368, 588 P.2d at 528. After the outfitter confirmed over the phone that he would take the agent on a guided hunt, the agent traveled to the outfitter's Montana home, paid him the agreed price, and he then took the agent on the hunt as agreed. *Leighty*, 179 Mont. at 368, 588 P.2d at 528. Based solely on the testimony of the undercover agent regarding their conversations and his observations at the outfitter's home and on the hunt, the State charged and successfully convicted the outfitter of "outfitting without a license," a misdemeanor in violation of Montana law. *Leighty*, 179 Mont. at 368, 588 P.2d at 528.[19]

---

[19] While the Fish and Game officers monitored and recorded the agent's conversations with the outfitter via an electronic body-wire transmitting device surreptitiously worn by the agent, the State neither presented the recordings at trial, nor offered any testimony from the officers who

28

¶27 On appeal, the outfitter asserted that the conviction was invalid on the ground that the State illegally obtained the incriminating evidence by warrantless use of an undercover agent in violation of the Fourth Amendment to the United States Constitution and Montana Constitution Article II, Section 11. *Leighty*, 179 Mont. at 369-71, 588 P.2d at 528-29. We noted, however, that the outfitter was knowingly and voluntarily engaged in "business dealings" with the agent, made no attempt to "shroud them" from him under "a veil of secrecy," and essentially incriminated himself by "reveal[ing]" his statements and conduct to the agent. *Leighty*, 179 Mont. at 370-71, 588 P.2d at 529. Further noting that the agent did not separately eavesdrop on any private conversation the outfitter did not intend for him to hear, we held that the outfitter had no objectively reasonable expectation of privacy in non-disclosure of what he revealed to the agent, and thus the warrantless use of the undercover agent did not violate any "right protected" under the Fourth Amendment or Article II, Section 11 of the Montana Constitution. *Leighty*, 179 Mont. at 370-71, 588 P.2d at 529 (citing *Hoffa v. United States*, 385 U.S. 293, 300 and 302, 87 S. Ct. 408, 413 (1966)).

¶28 Similarly, in *Hoffa*, a confidential FBI informant, who was a close associate of Teamsters Union President James R. Hoffa, was frequently in the company of Hoffa and his inner circle in and about their hotel suite and the courthouse while Hoffa was on trial under criminal indictment in federal court. *Hoffa*, 385 U.S. at 295-96, 87 S. Ct. at 410. *Inter alia*, the informant reported to the FBI that he was personally present and a party to

---

monitored the transmissions as to what they heard on the transmissions and recordings. *Leighty*, 179 Mont. at 368-69, 588 P.2d at 528-29.

several conversations wherein Hoffa and other associates discussed efforts made by them to bribe the jury in Hoffa's favor. *Hoffa*, 385 U.S. at 296, 87 S. Ct. at 410. Following a hung jury in that case, the government later indicted and convicted Hoffa and three others for jury bribery based in part on the testimony of the confidential informant. *Hoffa*, 385 U.S. at 296, 87 S. Ct. at 410. On appeal, the Supreme Court considered whether the government illegally obtained the incriminating evidence in violation of the defendants' Fourth Amendment right to privacy through the warrantless use of a confidential informant who violated their trust and confidence in the privacy of their personal conversations. *Hoffa*, 385 U.S. at 300, 87 S. Ct. at 412-13.

¶29 As a preliminary matter, the Supreme Court recognized that the defendants had a legitimate circumstantial expectation that government agents were not secretly eavesdropping on their seemingly private conversations by independent means, but distinguished that expectation from their "misplaced confidence" and resulting expectation that a trusted associate with whom they "confide[d] in . . . wrongdoing" would not subsequently repeat it to others. *Hoffa*, 385 U.S. at 301-02, 87 S. Ct. at 413-14. Further noting that the crux of the issue was the defendants' misplaced confidence in their associate, rather than the private settings of the conversations, the Court concluded that "[t]he risk of being . . . betrayed by an informer or deceived as to the identity of one with whom one deals is . . . inherent in the conditions of human society" and "the kind of risk . . . necessarily assume[d] whenever [one] speak[s]." *Hoffa*, 385 U.S. at 302-03, 87 S. Ct. at 413-14 (internal punctuation and citations omitted). The Court thus held that the

30

defendants had no legitimate expectation of privacy that their associate would not subsequently disclose information that they knowingly and voluntarily disclosed to him. *Hoffa*, 385 U.S. at 302-03, 87 S. Ct. at 413-14 (internal citations omitted).[20]

¶30 Here, as in *Allen*, *Goetz*, and *Hoffa*, Staker had an objectively reasonable expectation of privacy that government agents were not separately intercepting, monitoring, or recording his text messages to "Lily" by independent electronic means. However, despite his focus on the circumstantially private nature and setting of the text messages, the crux of Staker's asserted expectation of privacy is, as in *Leighty* and *Hoffa*, his misplaced trust and reliance that "she" was in fact the purported sex worker he believed "her" to be. Regardless of the digital electronic nature of the cell phone text messaging medium of communication, Staker's subjective expectation that he was sending text messages to a sex worker known only as "Lily" was not compromised, invaded, or otherwise infringed by any separate means of surreptitious electronic monitoring, interception, or recording by a government agent. Nor did the government invade, view, or capture any information stored on Staker's cell phone, tap into the cellular phone network, or obtain copies of the messages from the cellular phone network provider.

---

[20] *See also United States v. White*, 401 U.S. 745, 749, 91 S. Ct. 1122, 1125 (1971) (noting that *Hoffa* "was left undisturbed by *Katz*" and "that however strong[] . . . [the] trust [for] an apparent colleague," an individual has no constitutionally protected privacy interest "when it turns out that [he or she] is a government agent" because there is no constitutional "protection to a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it. . . . No warrant to 'search and seize' is required in such circumstances, nor is it when the Government sends to defendant's home a secret agent who conceals his identity and makes a[n] [illegal] purchase . . . from the accused"—(internal punctuation and citations omitted).

31

Rather, each time Staker hit "send" on his cell phone, he knowingly and voluntarily unveiled and sent his text messages for reading and storage on a cell phone purportedly belonging to a person known only to him as "Lily," with no reliable basis upon which to trust and rely that "she" would not later disclose or share those messages with others including law enforcement, or even that "she" was in fact who he believed "her" to be. The veil of Staker's subjective expectation of privacy in nondisclosure of the source or content of his text messages was not pierced by any means of electronic monitoring or recording by the government, but by his misplaced trust that "Lily" was in fact who he thought "she" was and that "she" would not thereafter disclose or share those messages with others including law enforcement.

¶31    Under these circumstances, Staker had no objectively reasonable expectation of privacy in messages sent for reading and storage on another person's electronic communication device any more than one can claim a reasonable expectation of privacy in correspondence or notes knowingly and voluntarily sent and delivered to another person's physical or email address. *See Goetz*, ¶ 35 (expectation that the person to whom one is speaking or otherwise discloses or exposes him or herself will not repeat or report it not objectively reasonable);[21] *State v. Armstrong*, 233 A.3d 610, 619 (N.J. Super. Ct. App. Div. 2020) ("[w]e are aware of no reported case holding that an individual maintains a reasonable expectation of privacy . . . as to data he chooses to share directly with another

---

[21] *Accord Wolfe*, ¶ 14 n.2 (citing *Goetz*, ¶ 35).

after that data has been received by the intended recipient"); *State v. Tentoni*, 871 N.W.2d 285, 288 (Wis. Ct. App. 2015) (sender generally has no reasonable expectation of privacy in text messages received and stored on recipient's cell phone); *State v. Patino*, 93 A.3d 40, 55-57 (R.I. 2014) (sender has no reasonable expectation of privacy in nondisclosure of text messages sent to and stored on recipient's cell phone due to loss of control over disposition by recipient); *State v. Carle*, 337 P.3d 904, 910-11 (Or. Ct. App. 2014) ("reasonable expectation of privacy in letters or text messages" prior to delivery does not equate with reasonable expectation of privacy in nondisclosure of the text message sent to and stored "on the recipient's phone" because sender has no "ability to control" disposition thereafter); *State v. Athan*, 158 P.3d 27, 37 (Wash. 2007) (concluding the defendant had no protected privacy interest in a letter mailed to an undercover detective posing as a lawyer regardless of his ignorance that the intended recipient was a detective rather than a lawyer); *United States v. Jacobsen*, 466 U.S. 109, 117, 104 S. Ct. 1652, 1658 (1984) ("individual [who] reveals private information to another . . . assumes the risk that his confidant will reveal that information to the authorities"); *Guest v. Leis*, 255 F.3d 325, 333 (6th Cir. 2001) (reasonable expectation of privacy in re contents of an email transmission ends upon delivery to receipt account); *United States v. King*, 55 F.3d 1193, 1195-96 (6th Cir. 1995) ("the sender's expectation of privacy" in contents of a letter "ordinarily terminates upon delivery" regardless of whether "the sender may have instructed the recipient to keep the letters private"—internal citations omitted); *United States v. Charbonneau*, 979 F. Supp. 1177, 1184-85 (S.D. Ohio 1997) (analogizing e-mail transmissions to hard-copy mail

33

transmittals – sender has reasonable expectation that contents will remain private and free from warrantless government intrusion only until delivered but not thereafter due to inability to control disposition by recipient).[22]

¶32    By analogy to *Leighty* and *Hoffa*, we hold that Staker's subjective expectation of privacy that "Lily" would not disclose or pass-on the subject text messages sent to her cell phone, or that she was in fact the purported sex worker he believed her to be rather than a cloaked government agent, were not objectively reasonable in society under the circumstances of this case.  We thus hold that the warrantless use of a cloaked law enforcement officer under an internet advertisement for sexual services, and the responsive text message conversation initiated by Staker to the listed cell phone number, did not intrude upon an objectively reasonable expectation of privacy and thus did not effect a constitutional search in violation of his right to privacy under Montana Constitution Article II, §§ 10-11.

**CONCLUSION**

¶33    Under the totality of the circumstances in this case, the warrantless use of a cloaked law enforcement officer under a fake internet advertisement for sexual services, and the responsive text message conversation initiated by Staker to the listed cell phone number in response thereto, did not intrude upon an objectively reasonable expectation of privacy and

---

[22] *See also Matter of Hopper*, 424 P.3d 228, ¶¶ 17-23 (Wash. App. 2018) (no reasonable expectation of privacy in text messages for sexual services intended for purported prostitute at listed number but actually sent to actual third-party owner of phone—decided under statutory privacy scheme).

thus did not effect a constitutional search in violation of his right to privacy under Montana Constitution Article II, §§ 10-11. The District Court thus correctly denied his related motions to suppress the text messages and accordingly dismiss the resulting charge of patronizing prostitution. We affirm.

/S/ DIRK M. SANDEFUR

We concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ LAURIE McKINNON
/S/ INGRID GUSTAFSON
/S/ JIM RICE