No. 14392

IN THE SUPREME COURT OF THE STATE OF MONTANA

1978

_____

THE STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

HOWARD NEIL SORENSON,

Defendant and Appellant.

_____

Appeal from: District Court of the Fourth Judicial District,
Honorable Jack L. Green, Judge presiding.

Counsel of Record:

For Appellant:

Morales, Volinkaty & Harr, Missoula, Montana
A. Bruce Harr argued, Missoula, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Douglas G. Harkin, County Attorney, Hamilton, Montana
Peggy Toner argued, Deputy County Attorney, Hamilton, Montana

_____

Submitted: November 14, 1978

Decided: JAN 3 1979

Filed: JAN 3 1979

_Thomas J. Kearney_
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

Defendant, Howard Neil Sorenson, appeals from a conviction of misdemeanor possession of dangerous drugs, namely marijuana, following a trial by jury in District Court, Ravalli County.

Sometime prior to April 22, 1977, defendant and his wife went to California for a vacation. The couple lived in a rural area near Hamilton, Montana, so before the trip, defendant asked Steve Burnham, a youth he had known for approximately one month, to care for his houseplants and animals during his absence. Defendant went to Steve's home, which is approximately one mile from defendant's residence, the night before he left for the vacation and gave Steve a key. While defendant was there, Steve's mother, Laurie Burnham, informed defendant that she would make sure the tasks were performed, either by Steve or herself. Defendant understood Mrs. Burnham as saying she would make sure Steve took care of the house. He made no reply to her statement.

On April 22, 1977, Steve Burnham's parents were advised of an incident that had taken place at the high school that day. Steve had taken a pornographic magazine into the school building and when asked by the principal to hand it over, had thrown it in the principal's face.

According to Mrs. Burnham, Steve came home from school very upset. He went upstairs, grabbed a rifle and told his mother he was "going to get" the high school principal. Mrs. Burnham persuaded Steve to give her the rifle and she calmed him down. He left the home approximately one-half hour later, headed in the direction of town. Fred Burnham, Steve's father, notified the Ravalli County Sheriff and the sheriff, in turn, notified the high school principal about the threats. The principal was asked to make himself unavailable.

Sometime later, the sheriff, a deputy and Steve's father arrived at the Burnham residence. Mr. Burnham recalled that Steve had a rifle, used for shooting gophers, that possibly was at the defendant's residence. It was decided that Steve may have gone to the defendant's residence, so the sheriff, deputy and Laurie Burnham went to the house in search of Steve.

Upon their arrival at defendant's residence, the peace officers made a cursory search of the outbuildings. They were unable to detect any movement or other indication that anyone was in the residence. Previously the sheriff had questioned Mrs. Burnham concerning who was taking care of the house. She stated that Steve had been asked to, but she had assured the defendant the job would be done. The sheriff did not question Mrs. Burnham as to the extent of her authority to enter the house.

With Mrs. Burnham leading the way, the officers entered defendant's house through an unlocked sliding glass door. As she opened the door, Mrs. Burnham told the officers she thought "it might not be quite right to enter the house." Two rifles were observed leaning against a couch. Mrs. Burnham identified one of the rifles, but under the circumstances, it was decided that both should be confiscated.

The trio was in the house for approximately fifteen minutes. While searching for Steve in the basement and other available rooms, the sheriff noticed a large "hooka-type" pipe in the bedroom, three pipes on a buffet and a jar of marijuana seeds on top of some contained garbage. In the living room, small marijuana plants were discovered growing among the houseplants and others were found in individual containers.

On May 3, 1977, eleven days after the search for Steve had been conducted, a search warrant was issued based on the

-3-

the sheriff's earlier observations. The contraband was seized and defendant was charged with misdemeanor possession of dangerous drugs, namely marijuana. A jury trial was set for October 6, 1977. Before the trial, the District Court heard testimony regarding defendant's motion to suppress evidence. Defendant contended that his constitutional right to be free from unreasonable searches and seizures, as guaranteed by the Fourth Amendment of the United States Constitution, had been violated. The District Court denied the motion, finding that Mrs. Burnham had authority to enter the house.

Defendant was found guilty and sentenced to one year in the Ravalli County jail, such sentence being suspended on various conditions.

For the reasons expressed herein, we need only consider defendant's primary issue on appeal.

Did circumstances exist which suspended the Fourth Amendment's warrant requirement and justified the peace officers' search of defendant's residence on April 22, 1977?

It is well established that under certain circumstances, peace officers may seize evidence in plain view without a warrant. Coolidge v. New Hampshire (1971), 403 U.S. 443, 29 L.Ed.2d 564, 91 S.Ct. 2022 reh.den. 404 U.S. 874, 30 L.Ed.2d 120, 92 S.Ct. 26. The "plain view" doctrine may be relied on if two threshold requirements are met: the officer must have a prior justification for the intrusion and the incriminating evidence must be discovered inadvertently in the course of the justified intrusion. 403 U.S. at 466.

The officers' initial intrusion in the instant case was not accomplished under the authority of a search warrant. Therefore, the intrusion must be justified under one of the recognized exceptions to the Fourth Amendment's warrant

requirement. This "prior justification" must be established before we can determine whether the officers' plain view observations were properly used as probable cause for the issuance of the search warrant on May 3, 1977.

"Searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment--subject only to a few specifically established and well-delineated exceptions." Katz v. United States (1967), 389 U.S. 347, 357, 19 L.Ed.2d. 576, 88 S.Ct. 507. "The exceptions are jealously and carefully drawn, and there must be a showing by those who seek exemption that the exigencies of the situation made that course imperative. The burden is on those seeking the exemption to show the need for it." Coolidge, 403 U.S. at 455 (emphasis added).

The State contends that, although the circumstances presented to the officers in this case do not fit into any single category of cases excepted from the warrant requirement, they nevertheless contain integral elements from various categories, which taken as a whole, reveal the reasonableness of the officers' intrusion. In view of the restrictive nature of the exceptions and their limited application, it cannot be said that the United States Supreme Court contemplated law enforcement officers relying on elements of various exceptions to justify their intrusion. We will not blend the well-delineated exceptions into one that will fit the facts of this case.

Peace officers in "hot pursuit" of a fleeing felon may enter premises without a warrant if the exigencies of the situation make that course imperative. Vale v. Louisiana (1969), 399 U.S. 30, 26 L.Ed.2d 409, 90 S.Ct. 1969; Warden, Maryland Penitentiary v. Hayden (1967), 387 U.S. 294, 18 L.Ed.2d 782, 87 S.Ct. 1642. In Hayden, police officers,

-5-

informed that an armed robbery had just occurred and that the suspect had entered a house minutes before their arrival, entered, searched the house and arrested the suspect. The Supreme Court, speaking through Mr. Justice Brennan, stated:

> ". . . The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others. Speed here was essential, and only a thorough search of the house for persons and weapons could have insured that Hayden was the only man present and that the police had control of all weapons which could be used against them or to effect an escape." 387 U.S. at 298.

The State contends a variation of the "hot pursuit" doctrine should be applied to this case because the officers were searching for an angry youth who had recently threatened violence against another and who had ready access to a weapon. This simply is not a "hot pursuit" case. The doctrine is unavailable to peace officers until a felony has been committed and the suspect is fleeing.

Another of the carefully defined exceptions to the Fourth Amendment's warrant requirement involves situations where officers have probable cause that they will find the instrumentality of a crime or evidence related to the crime. Dyke v. Taylor Implement Mfg. Co. (1968), 391 U.S. 216, 20 L.Ed.2d 538, 88 S.Ct. 1472. Again, exigent circumstances must exist, making it impracticable to obtain a warrant. Coolidge, 403 U.S. at 460.

If we assume that the officers entered defendant's residence under the reasonable belief that they would find the youth or a weapon and thereby prevent the commission of a violent crime, we cannot say that an emergency situation existed that would justify violating the privacy of defendant's home. As stated by Mr. Justice Douglas in McDonald v. United States (1948), 335 U.S. 451, 455, 93 L.Ed. 153, 69 S.Ct. 191:

-6-

"We are not dealing with formalities.
The presence of a search warrant serves
a high function. Absent some grave
emergency, the Fourth Amendment has
interposed a magistrate between the
citizen and the police. This was done
not to shield criminals nor to make
the home a safe haven for illegal activities.
It was done so that an objective mind
might weigh the need to invade that privacy
in order to enforce the law. The right
of privacy was deemed too precious to
entrust to the discretion of those whose
job is the detection of crime and the arrest
of criminals. Power is a heady thing; and
history shows that the police acting on
their own cannot be trusted. And so the
Constitution requires a magistrate to pass
on the desires of the police before they
violate the privacy of the home. We cannot
be true to that constitutional requirement
and excuse the absence of a search warrant
without a showing by those who seek exemption
from the constitutional mandate that the
exigencies of the situation made that course
imperative."

Precautionary measures had been taken to insure the safety of the high school principal. The youth had left his home a half hour after his mother had calmed him down. He headed in the direction of town, away from defendant's residence. Defendant's residence was in a rural area, far from any possible scene of violence. The State concedes that an emergency situation did not exist at defendant's residence. In fact, the youth's mother was the first to enter the residence. Other courses of conduct were available to the officers. The State has failed to meet its burden. The exigencies of the situation did not make entry imperative.

Finally, the State contends defendant's constitutional rights were waived by a third party, namely Laurie Burnham, the youth's mother.

A search which is conducted pursuant to the consent of the party being searched meets the Fourth Amendment's standard of reasonableness, Davis V. United States (1946),

328 U.S. 582, 90 L.Ed. 1453, 66 S.Ct. 1256; reh.den. 329 U.S. 824, 91 L.Ed. 700, 67 S.Ct. 107; Zap v. United States (1946), 328 U.S. 624, 90 L.Ed. 1477, 66 S.Ct. 1277, vacated on rehearing on others grounds 330 U.S. 800, 91 L.Ed. 1259, 67 S.Ct. 857. Additionally, ". . . when the prosecution seeks to justify a warrantless search by proof of a voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." United States v. Matlock (1974), 415 U.S. 164, 171, 39 L.Ed.2d 242, 94 S.Ct. 988.

The District Court determined that Laurie Burnham had authority to enter defendant's home. But did she have authority to consent to the officer's entry? Did she possess "common authority" over the home or have some other "sufficient relationship" with the home that would enable her to allow the officers inside? "Common authority" was defined in Matlock, 415 U.S. at 171, n. 7:

> "7. Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, see Chapman v. United States, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961) (landlord could not validly consent to the search of a house he had rented to another), Stoner v. California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964) (night hotel clerk could not validly consent to search of customer's room) but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched."

Laurie Burnham was not a co-inhabitant of the home. She could not permit an inspection in her own right. Therefore, her consent was valid only if it can be shown that she possessed some other "sufficient relationship" with the home.

The defendant asked the youth, Steve Burnham, to care for his houseplants and animals while he was away, nothing more. He did not ask Laurie Burnham to care for his house. The key had been given to Steve, thereby giving him, not Laurie Burnham, constructive possession of the house. Laurie Burnham merely gratuitously guaranteed that her son would perform the tasks. Even assuming she obtained implicit permission to enter the house because the defendant did not respond to her offer, her authority was limited to enter to perform the requested tasks. She did not possess a "sufficient relationship" with the residence which would give her authority to consent to a search.

We conclude that the evidence should have been suppressed because of the unlawful entry.

Reversed for disposition in accordance with this opinion.

_John C. Shehy_
Justice

We Concur:

_Frank I. Haswell_
Chief Justice

_Jean B Daly_

_John Conway Harrison_

_Daniel J. Shea_
Justices

-9-