FILED

12/28/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0382

DA 20-0382

IN THE SUPREME COURT OF THE STATE OF MONTANA

2021 MT 324

STATE OF MONTANA,

Plaintiff and Appellee,

v.

QUINCY SMITH,

Defendant and Appellant.

APPEAL FROM: District Court of the Twenty-First Judicial District,
In and For the County of Ravalli, Cause No. DC-20-24
Honorable Howard F. Recht, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Dwight J. Schulte (argued), Schulte Law Firm, P.C., Missoula, Montana

For Appellee:

Austin Knudsen, Montana Attorney General, Brad Fjeldheim (argued),
Assistant Attorney General, Helena, Montana

William Fulbright, Ravalli County Attorney, Hamilton, Montana

Argued and Submitted: November 3, 2021

Decided: December 28, 2021

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1    Quincy Smith appeals the Twenty-First Judicial District Court's order denying his motion to suppress evidence obtained when law enforcement officers entered his private property without a warrant. We address the following issues on appeal:

> *1. Did Smith have a reasonable expectation of privacy in the driveway of his residence when he told a sheriff's deputy attempting to effectuate a traffic stop that he was trespassing and needed a warrant?*
>
> *2. Did exigent circumstances exist to allow the sheriff's deputy to conduct a warrantless investigation on the property?*

We hold that the deputy sheriff properly entered the driveway when he already had initiated a traffic stop but exceeded his authority after Smith asked him to leave. We therefore reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2    On May 15, 2019, Smith and his friend Jacques Hennequin were driving eastbound on Hidden Valley Road in Ravalli County to Hennequin's house, where Smith resided. Ravalli County Sheriff's Deputy Nicholas Monaco, driving westbound on Hidden Valley Road, observed Smith's vehicle traveling at approximately 57 miles per hour—17 miles per hour over the speed limit. Deputy Monaco activated his lights, turned around, and pursued Smith. Deputy Monaco's dash camera footage shows that Smith's vehicle was visible for approximately one second before it rounded an "S" shaped curve in the road. Approximately twenty-one seconds after Deputy Monaco activated his lights, Smith turned down a 350-foot residential driveway and parked next to the garage.

¶3     The Hennequins' house is located on five acres.  It has a perimeter fence and an interior fence around the house and yard.  Although both fences have gates, neither gate was closed that night, and there was no gate at the entrance to the driveway.  The residence is surrounded by trees and foliage, and the physical nature of the property secludes it from the road and neighboring properties.  The property did not have any "No Trespassing" signs posted.

¶4     Shortly after Smith parked his vehicle, Deputy Monaco pulled into the driveway and approached Smith and Hennequin.  He advised them that Smith had been speeding. Smith and Hennequin both immediately informed Deputy Monaco that he was on private property and requested that he return with a warrant:

SMITH: Sir we were just down the way –

MONACO: I understand that.

SMITH: – just pulling in here.  Thirty seconds away. We just –

MONACO: I understand that.  Are you the passenger, sir?

HENNEQUIN: Yeah.

MONACO: Ok. Do you have ID on you?

HENNEQUIN: Yeah

MONACO: Ok.

HENNEQUIN: I mean, do you need it?  I mean, this is my house.

.   .   .

SMITH: You're on private property.

MONACO: I understand that.

SMITH: You're on private property.

3

SMITH: I'm pretty sure you can't pull in like this.

HENNEQUIN: Yeah, you really can't, man.

MONACO: Ok, are you going to provide me your license, registration, and insurance?

SMITH: At this point right now –

HENNEQUIN: You know what? No, we're not—

SMITH: At this point—

HENNEQUIN: We're not.  You can go get a warrant, man.

¶5      Deputy Monaco did not leave the property or obtain a warrant.  Instead, he requested back-up and continued his investigation by asking Smith for his driver's license and registration.  The stop ripened into a driving under the influence (DUI) investigation after Deputy Monaco observed that Smith smelled of alcohol and inquired if he had been drinking.  Smith admitted that he had a few drinks at a local bar.  Sergeant Guisinger, Deputy Monaco's back-up, arrived and the confrontation continued.  Sergeant Guisinger tased Smith after he refused to comply with the officers' directives, and Deputy Monaco arrested him.

¶6      The State charged Smith with speeding, in violation of § 61-8-309, MCA, obstructing a peace officer in violation of § 45-7-302, MCA, DUI in violation of § 61-8-401, MCA, and resisting arrest in violation of § 45-7-301, MCA, all misdemeanors. Smith moved the Justice Court to suppress all evidence obtained from Smith's contact with the officers, arguing that he had a reasonable expectation of privacy in the driveway of the

residence and that Deputy Monaco's warrantless entry and refusal to leave the property violated his constitutional rights. The Justice Court denied the motion without a hearing. Following a bench trial, the court found Smith guilty of all charges.

¶7 Smith appealed to the Twenty-First Judicial District Court. At a hearing on the motion to suppress, Hennequin and his wife Carli testified to the privacy of their home, explaining that the secluded nature of the property was their biggest consideration in purchasing it. Deputy Monaco testified to the circumstances of the stop, including his pursuit, his interaction with Smith and Hennequin, and his belief that a warrant was not necessary to enter the driveway of the residence.

¶8 The District Court denied Smith's motion to suppress, concluding that Smith did not have a reasonable expectation of privacy. The court explained that there was "[n]o evidence indicat[ing] that either defendant or Hennequin required prior permission before entering the property" and that the property must have more than "landscaping and field fencing" to "confer an expectation of privacy equivalent to that conferred upon a residence." Because the court found that Smith had no reasonable expectation of privacy in the driveway, it did not address whether exigent circumstances justified Deputy Monaco's warrantless entry. Smith pleaded guilty to a misdemeanor DUI, reserving his right to appeal the District Court's denial of his motion to suppress.

## STANDARDS OF REVIEW

¶9 We review the denial of a motion to suppress to determine whether the lower court's findings of fact were clearly erroneous; we review de novo the court's interpretation and

5

application of the governing law. *State v. Staker,* 2021 MT 151, ¶ 7, 404 Mont. 307, 489 P.3d 489 (citations omitted). A finding of fact is clearly erroneous if it is not supported by substantial credible evidence, if the lower court has misapprehended the effect of the evidence, or if our review of the record creates a firm conviction that a mistake was made. *State v. Hoang Vinh Pham*, 2021 MT 270, ¶ 11, 406 Mont. 109, 497 P.3d 217 (citing *City of Missoula v. Metz*, 2019 MT 264, ¶ 12, 397 Mont. 467, 451 P.3d 530).

## DISCUSSION

¶10    *1. Did Smith have a reasonable expectation of privacy in the driveway of his residence when he told a sheriff's deputy attempting to effectuate a traffic stop that he was trespassing and needed a warrant?*

¶11    The Fourth Amendment to the United States Constitution and Article II, Section 11, of the Montana Constitution prohibit unreasonable searches and seizures. "The fundamental purpose of the Fourth Amendment and Article II, Section 11 is to protect the privacy and security of individuals from unreasonable government intrusion or interference." *Hoang Vinh Pham*, ¶ 13 (citation and internal quotation omitted).

¶12    "States are free to grant citizens greater protections based on state constitutional provisions than the United States Supreme Court divines from the United States Constitution." *State v. Bullock*, 272 Mont. 361, 383-84, 901 P.2d 61, 75 (1995) (citations omitted). Montana has done so through Article II, Section 10, of the Montana Constitution, which provides that the right of individual privacy "shall not be infringed without the showing of a compelling state interest." Because of that heightened privacy right, the

6

Montana Constitution affords broader protection against searches and seizures than does the Fourth Amendment alone. *Bullock*, 272 Mont. at 383, 901 P.2d at 75.

¶13　Smith argues that he had a reasonable expectation of privacy in the driveway of his residence. Because the driveway is within the curtilage of the home or, alternatively, because the nature of the property satisfies *Bullock*, Smith asserts that Deputy Monaco's warrantless entry onto the property and refusal to leave over Smith's repeated requests violated his right to be free from unreasonable searches.

¶14　The State responds that Smith did not have an expectation of privacy that society would recognize as reasonable. Smith's property, the State asserts, is distinguishable from that in *Bullock*, and Smith's failure to stop gave implied consent for Deputy Monaco to enter the property.

¶15　Montana's heightened right to privacy cannot be construed to offer less protection than what the Fourth Amendment guarantees. *See Bullock*, 272 Mont. at 383, 901 P.2d at 75. Under the Fourth Amendment, a person has a reasonable expectation of privacy within the curtilage of his or her home—the area immediately surrounding a dwelling—but not beyond that. *Florida v. Jardines*, 569 U.S. 1, 6-7, 133 S. Ct. 1409, 1414-15 (2013). The United States Supreme Court has found a front porch, the area "outside the front window," and a garage all within the curtilage of the home. *Jardines*, 569 U.S. at 6-7, 133 S. Ct. at 1415; *see Lange v. California*, 594 U.S. __, __, 141 S. Ct. 2011, 2018 (2021). In *Collins v. Virginia*, the Court held that a driveway was within the curtilage of the home when it ran alongside the front yard, the top portion of the driveway sat behind

7

the front perimeter of the house, and the top of the driveway was enclosed on two sides by brick wall and by the house on a third side. 584 U.S. __, __, 138 S. Ct. 1663, 1670-71, (2018). The house was accessible from the driveway through a side door. *Collins*, 584 U.S. at __, 138 S. Ct. at 1670-71. The Court held that the driveway was "properly considered curtilage," explaining that the driveway was an extension of the home, the area searched was "adjacent to the home," and "activity of home life extend[ed]" onto the driveway. *Collins*, 584 U.S. at __, 138 S. Ct. at 1671 (internal quotations omitted).

¶16 We find it unnecessary to determine whether the driveway was within the curtilage of Smith's dwelling under the *Collins* framework. If it was not and Smith did not have a reasonable expectation of privacy under the Fourth Amendment, our review is not cabined by a Fourth Amendment analysis. If it was within the curtilage, we would reach the same outcome given our analysis under the Montana Constitution.

¶17 We turn to that analysis. In *Bullock*, we rejected the distinction between curtilage and open fields drawn under the Fourth Amendment, refusing as "repugnant to our State's explicit recognition of privacy as a fundamental right" a categorical rule that an individual does not have a right to privacy in open fields. *Bullock*, 272 Mont. at 384, 901 P.2d at 75. Under *Bullock* and its progeny, to determine whether an unlawful government search has occurred, we look to "(1) whether [an individual has] an actual expectation of privacy . . .; (2) whether society is willing to recognize that expectation as objectively reasonable; and (3) the nature of the [S]tate's intrusion" to determine whether an unlawful government

8

search has occurred. *Estate of Frazier v. Miller*, 2021 MT 85, ¶ 25, 404 Mont. 1, 484 P.3d 912 (quoting *State v. Smith*, 2004 MT 234, ¶ 10, 322 Mont. 466, 97 P.3d 567).

¶18 An individual has an actual expectation of privacy beyond the curtilage of his or her home when the individual has evidenced the expectation "by fencing, [by posting] 'No Trespassing' or similar signs, or 'by some other means [which] indicates unmistakably that entry is not permitted.'" *Bullock*, 272 Mont. at 384, 901 P.2d at 75-76 (citing *New York v. Scott*, 593 N.E.2d 1328, 1338 (N.Y. 1992)). We held in *Bullock* that the defendant had an actual expectation of privacy beyond the curtilage of his cabin because the defendant had gone to great lengths to protect the privacy of his cabin by moving it back from the road, erecting a fence and gate between his property and the road, and posting "No Trespassing" signs. *Bullock*, 272 Mont. at 385, 901 P.2d at 76.

¶19 Smith argues that he had an actual expectation of privacy on the property under *Bullock* because of the length of the driveway, the perimeter and interior fencing surrounding the property, and the naturally secluded nature of the property. Smith points to the Hennequins' testimony that the privacy of the home was their "biggest consideration" in purchasing the property to evidence their subjective expectation of privacy. True, the property is secluded, but as the District Court recognized, neither the Hennequins, as owners of the property, nor Smith, as a resident, "took measures" to evidence their expectation of privacy or communicated that "entry [was] not permitted." *See State v. Hubbel*, 286 Mont. 200, 209, 951 P.2d 971, 976 (1997). Both the perimeter and interior fences had gates, but neither gate was closed, and nothing indicated that entry

to the driveway was not permitted. Neither the Hennequins nor Smith had posted "No Trespassing" signs on either fence. Though foliage and the property's natural features shielded the residence from view, neither the Hennequins nor Smith took any affirmative steps to protect the privacy of the property or to "indicat[e] unmistakably" that no entry was permitted. *See Bullock*, 272 Mont. at 381, 901 P.2d at 74. This is contrary to *Bullock*, where the landowner moved his cabin further from the road, erected a fence between the road and the property, and posted "No Trespassing" signs for privacy. 272 Mont. at 384-85, 901 P.2d at 76. No similar measures gave warning to Deputy Monaco that he should not enter the property to complete the traffic stop he had initiated on a public road.

¶20 The dynamic changed, however, once Deputy Monaco confirmed that Smith had just arrived at his own home. Smith told the Deputy that he was trespassing on private property. Smith communicated to Deputy Monaco in clear terms that "entry [was] not permitted," *see Hubbel*, 286 Mont. at 209, 951 P.2d at 976, telling him that he needed to leave the property if he did not have a warrant. This clear invocation of privacy rights demonstrated to Deputy Monaco that Smith had an actual expectation of privacy on the property. *See Bullock*, 272 Mont. at 384, 901 P.2d at 76; *Hubbel*, 286 Mont. at 209-10, 951 P.2d at 976.

¶21 Whether an individual's privacy expectation is reasonable depends upon several overlapping factors, including "the place of the investigation, the control exercised by the person over the property being investigated, and the extent to which the person took

10

measures to shield the property from public view, to communicate entry is not permitted, or to otherwise protect his property from intrusion." *Hubbel*, 286 Mont. at 209, 951 P.2d at 976. *See also State v. Dunn*, 2007 MT 296, ¶ 13, 340 Mont. 31, 172 P.3d 110. Society recognizes an actual expectation of privacy as reasonable when a resident makes that expectation "unmistakably" apparent through "No Trespassing" signs, gates, or by communicating that entry is not allowed. *Bullock*, 272 Mont. at 384, 901 P.2d at 76; *Hubbel*, 286 Mont. at 209-10, 951 P.2d at 976. We held in *Bullock* that the defendant's expectation of privacy was reasonable because he took numerous affirmative steps to communicate his actual expectation of privacy by moving his cabin back from the road to shield it from view, posting "No Trespassing" signs, and erecting a fence and gate. 272 Mont. at 384, 901 P.2d at 75-76. Conversely, in *Hubbel*, we held the defendant had no reasonable expectation of privacy in the property leading up to his front door when the property abutted a heavily trafficked highway and the defendant took no steps to shield the property from public view or to prevent passersby from approaching the house. 286 Mont. at 210, 951 P.2d at 977. Unlike in *Bullock*, neither Smith nor the Hennequins took affirmative action to keep people from coming up the driveway. Once Smith told Deputy Monaco that he was trespassing and told him to obtain a warrant, however, that communication was unmistakable. The privacy of the home is at the "very core" of constitutional search and seizure protections. *Collins*, 584 U.S. at ___, 138 S. Ct. at 1670. Society would recognize Smith's actual expectation of privacy as reasonable when he refused to answer a law enforcement officer's questions outside his own home absent a

11

warrant. *See Bullock*, 272 Mont. at 384, 901 P.2d at 76; *Hubbel*, 286 Mont. at 209-10, 951 P.2d at 976.

¶22 Finally, we look to the nature of the State's intrusion to determine whether it infringed upon Smith's reasonable expectation of privacy. *Estate of Frazier*, ¶ 19. The State does not dispute that Deputy Monaco conducted a search but argues that the nature of the intrusion was minimal given the circumstances of the stop. We agree that Deputy Monaco acted appropriately in pursuing Smith's vehicle into the driveway on his reasonable belief that Smith was aware that he was being stopped. Unlike in *Bullock*, where law enforcement officers entered Bullock's property to conduct an investigation, Deputy Monaco entered the property to effectuate a traffic stop he initiated on a public road. 272 Mont. at 384-85, 901 P.2d at 76. Deputy Monaco's initial questions to ascertain who lived at the home and whether Smith was the driver were minimally intrusive and necessary to inform him whether he should continue or seek a warrant for further investigation. *See City of Missoula v. Kroschel*, 2018 MT 142, ¶¶ 14-15, 391 Mont. 457, 419 P.3d 1208 (incident to a lawful stop, law enforcement officers may request a person's name, current address, and an explanation of the person's conduct). *See also State v. Boyer*, 2002 MT 33, ¶¶ 25, 33, 308 Mont. 276, 42 P.3d 771 (a game warden's entry onto the transom of a boat to briefly question the angler and inspect his fish was a minimal intrusion). After those preliminary questions, Smith explicitly invoked his right to privacy. At that point, the State's intrusion became more extensive when Deputy Monaco began to question Smith about his drinking and expanded the investigation to one for DUI. To the

12

extent that Smith brought the encounter onto the property and implicitly consented to Deputy Monaco's presence, that consent was explicitly revoked once Smith asserted that Deputy Monaco was trespassing and requested that he obtain a warrant. At that point, the Deputy's continued questioning subjected Smith to a search requiring either a warrant or an exception to the warrant requirement.

¶23    *2. Did exigent circumstances exist to allow the sheriff's deputy to conduct a warrantless investigation on the property?*

¶24    When an individual has a reasonable expectation of privacy, a search conducted without a warrant is presumptively unreasonable unless it meets one of few delineated exceptions. *Bullock*, 272 Mont. at 374, 901 P.2d at 70. Exigent circumstances are one exception to the warrant requirement. *State v. Saale*, 2009 MT 95, ¶ 10, 350 Mont. 64, 204 P.3d 1220 (citing *State v. Wakeford*, 1998 MT 16, ¶ 22, 287 Mont. 220, 953 P.2d 1065). An exigent circumstance is one "that would cause a reasonable person to believe that entry (or other relevant prompt action) was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *Wakeford*, ¶ 24. The State bears a heavy burden of showing that an exigent circumstance exists. *Saale*, ¶ 10 (citing *Wakeford*, ¶ 24).

¶25    The State asserts that the Justice Court and District Court were correct in denying Smith's motions to suppress because exigent circumstances justified Deputy Monaco's warrantless entry. The State first argues that Smith's failure to stop after Deputy Monaco initiated contact constituted hot pursuit. Law enforcement in "hot pursuit" of a fleeing

13

felon may make a warrantless entry "if the exigencies of the situation make that course imperative." *State v. Sorenson*, 180 Mont. 269, 273, 590 P.2d 136, 139 (1979) (citations and quotations omitted). *See also State v. Dow*, 256 Mont. 126, 130, 844 P.2d 780, 783 (1992). We held in *Sorenson* that law enforcement did not have exigent circumstances to enter the defendant's home in pursuit of a teenager who had threatened a school principal while house-sitting for the defendant. *Sorenson*, 180 Mont. at 274-75, 590 P.2d at 139-40. We concluded that officers were not in hot pursuit of the teenager because the principal's safety was secured and there was no immediate threat of harm. *Sorenson*, 180 Mont. at 275, 590 P.2d at 140. We held that hot pursuit justifies a warrantless entry only if "a felony has been committed and the suspect is fleeing." *Sorenson*, 180 Mont. at 274, 590 P.2d at 139. In its brief on appeal, the State urges us to expand our holding in *Sorenson* to include fleeing misdemeanants, citing a split in jurisdictions on the issue.

¶26 Contemporaneous with the State's filing of its brief in this appeal, the United States Supreme Court addressed the issue of fleeing misdemeanants. *Lange v. California*, 594 U.S. __, 141 S. Ct. 2011 (2021). There, in a situation much like Smith's, an officer tried to initiate a stop approximately one hundred feet from Lange's home. *Lange*, 594 U.S. at __, 141 S. Ct. at 2016. Instead of stopping, Lange pulled into his driveway and parked in his attached garage. *Lange*, 594 U.S. at __, 141 S. Ct. at 2016. The officer followed Lange into the garage, observed signs of intoxication, ran field sobriety tests, and arrested Lange for a misdemeanor DUI. *Lange*, 594 U.S. at __, 141 S. Ct. at 2016. Amicus appointed to represent California's interests argued that the

14

Supreme Court should adopt a categorical rule that exigency exists in every case of misdemeanor pursuit. *Lange*, 594 U.S. at __, 141 S. Ct. at 2018. Rejecting such a broad-sweeping rule, the Court observed:

> The flight of a suspected misdemeanant does not always justify a warrantless entry into a home. An officer must consider all circumstances in a pursuit case to determine whether there is a law enforcement emergency. On many occasions, the officer will have good reason to enter [without a warrant]—to prevent imminent harms of violence, destruction of evidence, or escape from the home. But when the officer has time to get a warrant, he must do so— even though the misdemeanant fled.

*Lange*, 594 U.S. at __, 141 S. Ct. at 2024.

¶27 A review of the record shows that the State did not demonstrate circumstances beyond Smith's failure to stop that created a "good reason" for Deputy Monaco to remain on the property without a warrant. *Lange*, 594 U.S. at __, 141 S. Ct. at 2024. It did not present evidence of any risk that Smith would escape from the home, harm the officer, or harm another person, or demonstrate that Deputy Monaco was unable to obtain a warrant or take steps to prevent Smith from escaping while he did so.

¶28 The State contends, though, that obtaining a warrant would have "hindered" Deputy Monaco's investigation and would have allowed Smith to "avoid liability" for the DUI because he could have claimed he consumed alcohol after arriving home. This argument fails to acknowledge that Deputy Monaco had seen no sign of impaired driving and did not have particularized suspicion that Smith was under the influence until over seven minutes into the stop when he observed that Smith smelled of alcohol. By this point, Smith had asserted his right to privacy and requested that Deputy Monaco obtain a warrant.

15

Deputy Monaco had stopped him only for speeding. "[T]he [exigent circumstances] exception is 'case-specific.'" *Lange*, 594 U.S. at __, 141 S. Ct. at 2018 (quoting *Riley v. California*, 573 U.S. 373, 388, 134 S. Ct. 2473, 2486 (2014)). The State did not demonstrate that, at the time Smith asserted his right to privacy, Deputy Monaco had exigent circumstances to meet the warrant exception. We conclude on the undisputed facts of the record that Smith's failure to stop for a minor traffic violation did not create an exigency allowing Deputy Monaco to conduct a warrantless investigation after Smith invoked his right to privacy.

## CONCLUSION

¶29 Smith had a reasonable expectation of privacy in the driveway of his residence once he told Deputy Monaco he was trespassing and needed to return with a warrant. The State did not prove exigent circumstances permitting a warrantless search. We reverse the District Court's judgment and remand with instruction to enter an order suppressing all evidence obtained by the officers after they were told to leave Smith's residence.

/S/ BETH BAKER

We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ DIRK M. SANDEFUR
/S/ INGRID GUSTAFSON
/S/ JIM RICE

16

Justice Jim Rice, specially concurring.

¶30   I generally concur with the Court's Opinion but write separately to expand upon the unique facts here and emphasize that, in my view, the Court's conclusion is a narrow one necessarily required by the U.S. Supreme Court's decision in *Lange*, but which should not unduly constrain law enforcement.

¶31   I agree with the Court's conclusion that Deputy Monaco (Monaco) was permitted to follow Smith up the driveway to complete the stop.  In my view, this was permissible not only because the incident began on a public roadway, but also because at that point Monaco did not have any indication that the driveway actually led to a residence owned by Smith, the suspect vehicle's driver.  The facts here are in contrast with *Bullock* and *Saale*, where law enforcement approached the defendants' residences specifically because they already believed the defendants lived there.  While I agree Smith had a privacy interest in Hennequin's house as a resident there, Monaco did not know any of that at the time Smith's car turned up the driveway.  A person's privacy interests do not extend to *any* private property.  *See Lange*, 594 U.S. at ___, 141 S. Ct. at 2018 ("Freedom in *one's own dwelling* is the archetype of the privacy protection secured by the Fourth Amendment") (citing *Payton v. New York*, 445 U.S. 573, 585, 587, 100 S. Ct. 1371, 1380 (1980)) (internal quotation marks omitted) (emphasis added).  Indeed, the rare circumstances that had developed at that point—the activation of the abundantly clear lights of Monaco's cruiser

during darkness,[1] followed by Smith's failure to stop, his immediate exit from the road, and entry upon a dirt road—raised ample reason to doubt that Smith was approaching a residence as opposed to evading the officer, or that the dirt road led to a residence that was his. Monaco was justified in following Smith's vehicle up the driveway because he could not have known Smith was heading to *his* residence rather than simply trying to flee or hide up a random road.

¶32     Once up the driveway, Monaco found Smith and Hennequin outside the vehicle. They had not entered the residence nor, based on the dash-camera video, made any attempt to. Instead, they both asserted that they were on private property and Monaco needed to leave and obtain a warrant. In my view, this initial assertion of rights was not sufficient by itself to put Monaco on sufficient notice that the house was indeed Smith's residence. In *Lange*, Defendant Lange drove into his garage after a stop was initiated on a public road, and the pursuing officer followed him into his garage. *Lange*, 594 U.S. at ___, 141 S. Ct. at 2016. By physically entering his garage, Lange took an affirmative act indicating he possessed an ownership or leasehold interest in the building sufficient to put the pursuing officer on notice that Lange was in a constitutionally protected space. Such affirmative action is necessary in cases such as this, where a suspect has not actually entered the residence, to avoid situations in which suspects simply flee to private property and fraudulently assert a privacy interest to evade law enforcement—a not unprecedented

---

[1] Indeed, Smith asked Monaco to turn the cruiser lights off, because they were so bright they could be seen by other, distant residences.

18

factual circumstance. This affirmative action need not be much, but enough to reasonably put law enforcement on notice that the suspect indeed resides at the location. Driving into a garage, as in *Lange*, is one such action, but a suspect could, by way of example, also use a remote garage door opener to open the garage, actually enter the residence, or have someone inside the residence vouch for his residence there. The latter is, in essence, what happened here. After an initial reluctance, Hennequin and Smith both produced identification to Monaco. Hennequin's identification proved that he did indeed reside there, and by his statements Hennequin backed up Smith's assertion of his constitutional rights. At that point, after the assertion of the privacy right, further warrantless *investigation* by Monaco was improper.

¶33 However, while *Lange* prohibits Monaco from further investigating Smith for DUI or arresting him for a misdemeanor without a warrant, there remains the matter for which Monaco was properly on the property—to complete a stop for the misdemeanor offense of speeding. Monaco had properly requested and obtained all of the information necessary to issue a Notice to Appear for the speeding violation. In that regard, Monaco had dash-camera footage capturing the incident and radar confirmation showing that Smith was speeding, heard Smith voluntarily admitting to that fact, learned Smith's status as the vehicle's driver, and had properly obtained his identification information. *See* § 61-8-309(6), MCA (speeding violation); § 61-8-703, MCA (authorizing warrantless arrest in speeding cases where radar establishes the driver was speeding); and § 46-6-310(1), MCA ("Whenever a peace officer is authorized to arrest a person without a warrant, the officer

may instead issue the person a notice to appear."). Monaco could have then completed his lawful stop by issuing Smith a Notice to Appear, for which he would have had a short time as necessary to continue interacting with Smith for that purpose. Issuance of a Notice to Appear is, by its nature, not a seizure because it is issued in lieu of arrest; nor can it be considered a "search." *See* § 46-6-310(1), MCA; *State v. Elison*, 2000 MT 288, ¶ 48, 302 Mont. 228, 14 P.3d 456 (defining a "search" as "the use of some means of gathering evidence which infringes upon a person's reasonable expectation of privacy"). If Monaco, therefore, detected the odor of alcohol on Smith's breath as he served the Notice to Appear, he would have detected that odor while in a place he had a lawful right to be. Because DUI is a misdemeanor, under *Lange*, Monaco was then required, after issuance of the Notice to Appear, to retreat from the property and obtain a warrant in order to conduct a DUI investigation. But he would not have had to retreat far, only back to the public road, where upon sufficient information to establish probable cause a search warrant could have been obtained, which the record indicates was eventually done telephonically.

¶34 Reduced to its core, the State's argument is that this is not the most expedient way to conduct an investigation. For better or worse, it would appear that *Lange's* holding gives little consideration to investigative expediency. Be that as it may, it is important to keep in mind that *Lange's* holding at bottom prohibits only a *categorical rule* that would permit warrantless entry into a residence to pursue a suspect fleeing a misdemeanor. *Lange*, 594 U.S. at ___, 141 S. Ct. at 2024-25. The Supreme Court was clear that if exigent circumstances are present—"prevent[ion of] imminent harms of violence, destruction of

20

evidence, or escape from the home"—warrantless entry is permissible. *Lange*, 594 U.S. at ___, 141 S. Ct. at 2024. If a pursuing officer reasonably believes such exigent circumstances are present, he may continue the pursuit or investigation; if there are no exigent circumstances regarding a misdemeanor, then the officer must obtain a warrant to continue the investigation. And, of course, a law enforcement officer may continue the hot pursuit of a person fleeing from a suspected felony. *Sorenson*, 180 Mont. at 274, 590 P.2d at 139. Here, there was no pursuit of a suspected felon, and no exigent circumstances established that would permit a warrantless investigation for an offense beyond the proper stop made for speeding.

/S/ JIM RICE

21